In the Interest of C.E.K. and C.D.K., Minor Children.

No. 05–05–00683–CV.

Court of Appeals of Texas, Dallas.

Nov. 14, 2006.

Rehearing Overruled Feb. 28, 2007.

Timothy W. Avery, McKinney, for Appellant.

Angela Ivory, Alyson Marie Dietrich, John A. Stride, Asst. Dist. Attys., McKinney, for Appellee.

Before Justices WHITTINGTON, BRIDGES, and LANG–MIERS.

## OPINION

Opinion by Justice BRIDGES.

Candace Keith (Mother) appeals the trial court's judgment terminating her parental rights to her two sons, C.E.K. and C.D.K. In eight issues, she contends the evidence is legally and factually insufficient to support a finding that (1) Mother knowingly placed or allowed the children to remain in conditions that endangered them, (2) she engaged in conduct or knowingly placed the children with a person who engaged in conduct that endangered them, or (3) termination of her parental rights was in the children's best interest; the trial court erred in admitting certain testimony; and it was error to terminate Mother's parental rights, as the trial court had discretion to preserve her rights and still safeguard the best interest of the children. For the reasons set forth below, we reverse the decree of termination and dismiss the suit affecting the parent-child relationship.

Following a report of domestic violence in November 2003, Collin County Child Protective Services (CPS) removed C.E.K. and C.D.K. from the home of Mother and Loai Sarabi (Father). Mother is the biological mother of both boys; Father is the biological father of the younger child. Initially, CPS sought to terminate the parental rights of both Mother and Father[1] but ultimately sought to terminate only Mother's rights. In the termination petition, CPS alleged that Mother (1) knowingly placed or allowed her sons to remain in conditions or surroundings that endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed them with persons who have engaged in conduct that endangered their physical or emotional well-being. TEX. FAM.CODE ANN. § 161.001(1)(D), (E) (Vernon Supp.2006). CPS also alleged that the termination of Mother's rights was in the children's best interest. *Id.* § 161.001(2). Six hearings concerning permanent placement of the children were held over nearly eighteen months. CPS eventually sought a permanent placement of both boys with Father. After a bench trial, the trial court ordered Mother's parental rights to both boys terminated and named Father the sole managing conservator of both boys, placing the older child with Father as a kinship placement. Mother brought this appeal.

In her first through fourth issues, Mother contends the evidence is legally and factually insufficient to support termination under the statutory conditions concerning endangerment. The trial court terminated Mother's parental rights under both section 161.001(1)(D) and (E) of the family code. Proof of either ground is sufficient to support termination. *In re*

N.R., 101 S.W.3d 771, 775 (Tex.App.-Texarkana 2003, no pet.).

■ In a termination case, the State seeks not merely to limit parental rights, but to end them finally and irrevocably. TEX. FAM.CODE ANN. § 161.206(b) (Vernon Supp.2006); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Parents' rights to "the companionship, care, custody and management" of their children are constitutional interests "far more precious than any property rights." *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Quoting the United States Supreme Court, the Texas Supreme Court has reiterated the fundamental constitutional rights and values underlying the protection of parental rights:

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," "basic civil rights of man," and "[r]ights far more precious ... than property rights." "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment.

*In re G.M.,* 596 S.W.2d 846 (Tex.1980) (quoting *Stanley v. Illinois,* 405 U.S. 645, 651–52, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)) (citations in original omitted).

■ Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the peti-

---

**1.** CPS sought termination of Mother's rights to both children, and Father's rights to the youngest child. The biological father of the older child voluntarily relinquished his rights. He is not a party to this appeal.

tioner to justify termination by "clear and convincing evidence." TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2006); *In re G.M.*, 596 S.W.2d at 847 (citing *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). " 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002). Actions breaking the link between a parent and child "can never be justified without the most solid and substantial reasons." *State v. Deaton*, 93 Tex. 243, 54 S.W. 901 (1900), *cited in Juan A.-- v. Dallas County Child Welfare*, 726 S.W.2d 241, 244 (Tex.App.-Dallas 1987, no writ). In a termination suit, acts done in the distant past, without showing a present or future danger to a child, cannot be sufficient to terminate parental rights. *Wetzel v. Wetzel*, 715 S.W.2d 387, 391 (Tex.App.-Dallas 1986, no writ) (citing *Hendricks v. Curry*, 401 S.W.2d 796, 800 (Tex.1966)).

■ In reviewing the legal sufficiency of the evidence, this Court looks at all of the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction about the truth of the matter on which CPS bears the burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex.2002). We assume that the factfinder resolved any disputed facts in favor of its finding, if a reasonable factfinder could so do, and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* at 266. But because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *See id.* ("Disregarding undisputed facts that

do not support the finding could skew the analysis of whether there is clear and convincing evidence").

■ When reviewing the factual sufficiency of the evidence to support a termination finding, we must give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. *Id.* at 266 (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002)). We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* The evidence is not factually sufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of its finding is so significant that a factfinder could not have reasonably formed a firm conviction or belief. *Id.*

■ To terminate parental rights under section 161.001(1)(E), the evidence must show the person "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon Supp.2006). This section refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act. *In re S.H.A.*, 728 S.W.2d 73, 85 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). "Endanger" means to "expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex.1996). Although "endanger" means more than a threat of physical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *Id.*

■ The relevant time frame to determine endangerment is before the children were removed. *Ybarra v. Tex. Dep't*

*of Human Servs.,* 869 S.W.2d 574, 577 (Tex.App.-Corpus Christi 1993, no pet.). It is not necessary that the offending conduct be directed at the child or that the child actually suffers injury. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). If the evidence "shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under [161.001(1)(E)] is supportable." *Id.* at 534. Domestic violence, want of self-control and propensity for violence may be considered as evidence of endangerment. *In re C.J.F.* 134 S.W.3d 343, 351 (Tex. App.-Amarillo 2003, no pet.). If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment. *Id.*

The record shows that, on November 23, 2002 the police responded to a domestic disturbance call with "possible injury to a child." At the scene, Mother accused Father of choking her and of having kicked their three-month-old child. Father accused Mother of threatening him with a knife and said she had tossed him their child. The officer saw bright red marks on both boys' bodies. The apartment appeared unsanitary, but Father and Mother stated they were in the process of moving to explain the conditions in the apartment. Due to the allegations and evidence, he placed both parents under arrest. Father was arrested and charged with injury to a child. Mother was arrested for aggravated assault.

The children were taken to the emergency room, and an examination revealed the three-month-old had a linear skull fracture on the right side of his head but did not require hospitalization. The doctor estimated the injury was no more than two weeks old. A CPS investigator met the boys at the emergency room and became concerned that the older child, two and one-half years old at the time, was developmentally delayed in his speech. Both boys were placed in custody with CPS and placed in foster care that night.

The Collin County grand jury, presented with the evidence pertaining to the incident on the night of removal, including the condition of the children, charged Father with injury to a child and no-billed Mother on the aggravated assault charge. The charge against Father was eventually dismissed.[2] Both parents admitted that, before the children were removed, they used marijuana periodically while the children were in the home. Although Mother admitted that she knew using marijuana during pregnancy could cause low birth weight, she used it while pregnant with the youngest child.

Father is not a United States citizen, but he has lived in the United States since he was six years old and has family members here. During the pendency of the case he had four criminal charges against him. The injury-to-a-child case emanated from the evening of removal. Subsequently, he was charged twice for burglary, based on Mother's complaints against him for breaking into the housing she moved into after the children were removed. He also had a criminal charge against him for manufacture and delivery of a controlled substance. He was in jail from March 2004 until the end of July 2004.

█ Viewing the evidence in the light most favorable to the termination order, we conclude the evidence is legally sufficient to establish the requisites under section 161.001(1)(E) because a reasonable factfinder could have formed a firm belief or conviction that Mother "engaged in con-

---

**2.** Father denied causing injury to the child but admitted using his toe to move the infant from the six o'clock to the nine o'clock position.

duct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(1)(E) (Vernon Supp. 2006).

We examine the entire record to determine factual sufficiency. Mother and Father dispute certain facts. Both admitted to domestic violence in the home, although both accused the other of being the aggressor. We conclude, after viewing the entire record, that the evidence is factually sufficient to allow a rational trier of fact to reasonably form a firm belief that Mother engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the children. *See In re C.J.F.* 134 S.W.3d at 351 (domestic violence, want of self-control and propensity for violence as evidence of endangerment).

Because the evidence is legally and factually sufficient to support the trial court's determination under section 161.001(1)(E), we need not address the other endangerment ground the court found to support termination. We overrule Mother's first through fourth issues.

**Best Interest**

■■■■ In her sixth and seventh issues, Mother contends the evidence is legally and factually insufficient to support the finding that termination of her rights is in the best interest of the children. In addition to a predicate violation, to terminate a party's parental rights, CPS must establish by clear and convincing evidence that termination is in the best interest of the children. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2006). There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *In re J.F.C.,*

96 S.W.3d at 294. The focus is on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective Servs.,* 907 S.W.2d 81, 86 (Tex. App.-Dallas 1995, no writ). The goal of establishing a stable permanent home for a child is a compelling state interest. *Id.* at 87; *In re S.H.A.,* 728 S.W.2d at 92.

■■■ The fact finder may consider a number of factors in determining the best interest of the child, including the following: the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the best interest of the child, plans for the child by those individuals or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976).

"Best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *Id.* The listed *Holley* factors are not exhaustive, and some of them may apply in any given case; in other cases, unlisted factors may be appropriately considered. *In re C.H.,* 89 S.W.3d at 27. Undisputed evidence of only one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child; other cases, however, will present "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice to uphold the jury's finding that termination is required." *Id.* One court has stated,

Although [the parent's offending] behavior may reasonably suggest that a child would be better off with a new family,

the best interest standard does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents.

*In re D.M.*, 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet.).

CPS argues termination is in the children's best interest because Mother demonstrated a lack of parenting skills, is unable to meet the children's physical and emotional needs, and is a continuing danger to the children. CPS argues that the children's need for a stable, permanent home outweighs the slow progress Mother has made.

At the time of trial, the younger child was eighteen months old and thus too young to express a preference. The older child, four years old at the time of trial, expressed a variety of emotions about his future living situation, including anger, aggression, and nervous "tics." His play therapist attributed these behaviors to confusion. He was told early on he would live with Mother, which was scheduled for February. Then he was told he might not live with her. His play therapist stressed that he was confused about permanence and not knowing who he would ultimately live with. She stressed he needed as much permanence and stability as possible.

At the time of trial in May 2005, Mother had worked part-time jobs, retaining full-time employment as a waitress during the three months before trial. There was testimony that she had unrealistic notions about buying a house, given her income and necessary living expenses. CPS deemed her housing situation over the course of the case as unstable. Except for the brief one-month stay when she was living in her brother's house, CPS found her housing unsuitable for children. At the time of trial, she had been in a two-bedroom apartment since February 2005, but CPS noted it had the barest of furnishings and looked like no one really lived there. Mother completed all of the required parenting classes early, even taking an additional class.

During the eighteen-month duration of this case, six hearings were held to ascertain suitable permanent placement for the children. The early Department reports stated that Mother is "genuinely concerned" for her children. Initially, the goal was to reunite the family, but the couple ultimately divorced in October 2004. Thereafter the goal became adoption and then that the toddler be placed with Mother and the infant with Father. This changed at the February 2005 hearing. CPS sought to modify the permanency order and to delay return of the oldest child to Mother. Testimony was heard on Mother's move out of her brother's house into housing CPS deemed unsuitable. Mother's visitation rights were suspended. Mother was unrepresented at the February hearing. Subsequently, her new counsel sought a hearing, and in March 2005 the trial court restored Mother's supervised weekly visits.

### CPS's Requirements

To secure the return of the children, the parents were required to provide a stable, safe living environment and verifiable employment. Both were required to undergo a psychological evaluation, a drug assessment and counseling and to take courses in parenting and anger management.

Over the eighteen-month course of this case, Mother attended 100% of the scheduled hour-long weekly visitation sessions with the children at the advocacy center, as well as the unsupervised visits that were scheduled during the case. Mother completed the 12–week program in anger management, receiving her certificate of

completion in July 2004. She completed the required parenting classes in April 2004 (Systematic Training for Effective Parenting) and August 2004 (Practical Parent Education for Kid's Sake). Mother voluntarily took another parenting class and one in infant CPR and first aid. She also took college classes.

Mother attended counseling, attending ten out of seventeen scheduled sessions. Her therapist, Robert Antonetti, affirmed that falling short of full attendance is not uncommon given work scheduling issues and in most of these cases the parent does not have a lot of financial resources. Her service plan required monthly doctor appointments to monitor her medications for attention-deficit disorder. Although she missed a number of monthly appointments, the doctor testified that the monitoring involved self-reporting by the patient and that he had no reason to believe that her medication was not working or that she was off her medications.

Father was required to enroll in the Battering Intervention and Prevention Program, which consisted of 24 sessions. When he entered the program in August 2004, he denied using any drugs or alcohol, and the counselor noted he "denied, minimized" his own actions with respect to domestic violence. In the counselor's notes on Father after each session, the counselor never checked the box indicating "Accountable" under the section entitled "Responsibility for Self." On three occasions, the counselor checked the box indicating Father "blames others" or "denies/minimizes" his own actions. Only in the exit survey did Father indicate that he had learned to take responsibility for his own actions. He did not assume any responsibility for the problems in his home or the removal of the children.

Father missed a number of visits with the children. Father told Mother he missed one visit because he had a hangover. Father denied in court having missed his visitation due to a hangover but refused to give any explanation until ordered to respond by the Court. He admitted having told her his absence was caused by his drinking but said he had lied because he did not want her to know he was sick.

At trial, Father conceded that at the time of removal he was "living a pretty wild life, partying, using drugs sometimes," and "a man about town." He stated that he has settled down now. When questioned about his continuing relationship with Mother, Father said he's made it clear to everyone he did not want a relationship, and that "it's nothing more or less than just sex." He testified, "If [Mother] gets terminated I don't want to see her and I won't," and "irresponsible as it may be, I was just having fun until this gets resolved."

### Observations During Visitation

The CPS worker and the CASA volunteer testified to their observations of Mother during her visitation over the eighteen-month period. CPS and CASA were critical of her parenting skills and offered as reasons for termination the following examples. The CPS worker testified that Mother was disorganized. Mother would turn her back on the youngest, C.D.K., for several minutes at a time. CPS related that one time it took up to forty minutes to change the older boy while the child was being potty trained. CPS also offered testimony that Mother was not attempting to bond with her youngest child. CPS felt Mother was not cooperating with CPS, because at the end of her one-hour visit she would kiss one child then the other, going back and forth between them, thus "intentionally stalling" the end of her visit.

CPS offered Denise Hallmark[3], the CASA volunteer, as a witness. Hallmark testified that, on two occasions, Mother left the younger child sleeping in his carrier. When Mother was asked about this, she testified that the infant was asleep the entire time and she let him sleep so she could spend one-on-one time with the older child. When the younger child awakened, she picked him up out of the carrier.

Hallmark testified that, when Mother fed the younger child, about nine months old at the time, she had trouble keeping his hands out of his mouth and, when bottle feeding, she didn't recline him enough. At the time she testified to this, he was already self-feeding. Hallmark testified that she witnessed the younger child eat food off the floor. When Mother turned her back to attend to the other child, the younger child was giving himself snacks off the table. Some of them fell to the floor and he ate them. When Hallmark told Mother this, "she wasn't all that concerned."

Hallmark testified that Mother brought inappropriate food for the boys to the visits. On one occasion she brought eggplant parmesan and the younger child "would have nothing to do with it" so Hallmark gave the child some fruit.[4]

Once when Mother was taking "an awful long time," Hallmark went into the bathroom to find Mother holding the child's pants out for him, instructing him to get in them, with the child running around the stalls, not understanding what Mother was asking. Hallmark testified there was no time left, so she took the child by the arm, brought him over to his pants, put his pants on him, "and we marched out of the bathroom."

Hallmark offered that Mother has let the children play with "inappropriate" items, including Mother's Polaroid camera, her cell phone, and a video camera. She felt these were not so much dangerous, as inappropriate for their ages. Hallmark thought Mother's allowing the older child to keep a Chapstick was dangerous, stating it "comes with a warning label and it's medicine."

Hallmark testified she was concerned for the safety of the boys in Mother's care. She witnessed the younger child almost fall off a rocking horse, but she was able to catch him. Hallmark testified that Mother is a "bad parent." She conceded, however, that her own children had indeed fallen and gotten injured and had probably eaten something off the floor.

At the hearing on April 14, 2005, Hallmark testified that she had gone to see both Father's and Mother's apartments on April 11 and was unable to make contact with either party. On April 12, Mother had a visit with the children. She arrived in sweat pants and a T-shirt. After the one-hour visit, Hallmark asked if she could see her apartment and she responded she had to go to work. Assuming Mother was going to change for work, Hallmark asked if she could follow her to the apartment. Mother replied she was going directly to work. Hallmark followed Mother to the parking lot with the intention of following her secretly. Hallmark waited and pulled out when Mother did, attempting to follow her. Mother was driving "pretty fast" and Hallmark lost her when Mother went through a yellow light.

---

3. Hallmark became involved with the case in December 2003, one month into her tenure as a CASA volunteer, and this was her second case.

4. On another occasion, Hallmark was critical of Mother bringing hard boiled eggs for the kids to eat.

Several hours later, Hallmark went to Mother's apartment, and after a three-minute delay, Mother let her into the apartment. Hallmark's complaint was that it did not look lived in and was not sufficiently furnished, having only a TV and a chair in the living room. Her complaint about the boys' bedroom was that it had a "mattress on the floor," although the picture Hallmark took shows it was a set with a mattress and box spring, although both were sitting on the floor.

In early November 2004, Hallmark stated that it was CASA's recommendation that the children not be returned to Mother because she had not demonstrated she had learned parenting skills or that she had stable employment or housing. She did conclude, however, that if only the older child were returned to Mother and CPS monitored with once-a-week visits, that CASA "could probably live with that." Hallmark admitted that she has on more than one occasion described Mother as "friendly, intelligent" and that she "genuinely cares for her children." She also admitted that Mother expresses affection to both children. When asked if she "would describe Mother as affectionate" she answered "yes."

At trial, Hallmark stated that she thought all mothers, including Mother in this case, have a special bond with their children. She earlier admitted that Mother is affectionate toward the children. Nonetheless, Hallmark testified that, after all these months given all the benefits granted Mother—"mercy upon mercy" in Hallmark's words—she felt Mother would not be anything but a detriment to the children. Hallmark conceded that Father felt that the children should have continuing contact with their Mother, based on his own experience as a child. She disagreed with him, stating she felt the children would not be harmed if their Mother had no contact with them in the future.

### Employment and Housing

Over the course of the case, Mother worked at a CVS drugstore, and thereafter she held three part-time jobs. In February 2005, she secured full-time work as a waitress and was still at the job at the time of trial in May 2005. Shortly after the children were removed, in November 2003, Mother moved to subsidized housing. About a year later, she was forced to leave after being accused of misstating her income and stating on the housing application that the boys were living with her. At a permanency hearing in November 2004, she testified she had arranged to live in her brother's five-bedroom home. One bedroom was set up for the boys, and her brother testified she and the boys could stay with them "as long as necessary." At the end of that hearing the trial court ordered increased visitation, to culminate in a monitored return of the older son to Mother in ninety days, with return of the youngest child to Father. A month later, Mother moved out of her brother's house, because his rules were "too restrictive." She reported to her counselor she felt it was the right move for her, although she acknowledged that staying in her brother's house would have been in the children's best interest.

At the beginning of January, Mother moved into a shared apartment with two college students. Although she reported to the caseworker she had known them for six months, testimony showed she had responded to an advertisement and had only met them days before. CPS deemed this arrangement unsuitable for the children because the roommates were students and not prepared to have a young child living with them, there was alcohol within a toddler's reach, and the place was not otherwise child-proofed. One month later,

Mother moved into a two-bedroom apartment of her own. There were so few furnishings that it appeared to the CASA volunteer, who visited in April 2005, that no one was living there. There was one bedframe in the master bedroom, and only a mattress set on the floor of the second bedroom, although Mother testified at the April hearing she thought that it was suitable for children to move in.

### Anger Management

Both Father and Mother admitted to violence in the home. Although they divorced in October 2004, they continued to see each other while maintaining separate living quarters. On the evening of the April 2005 hearing, about three weeks before trial, Mother went to Father's apartment when he did not answer his cell phone. Mother and Father had been together all afternoon looking to purchase a car. She testified that he had her work shirt at the apartment and promised to make it available. A neighbor testified that she banged on his door for ten minutes, although Father was not there, and it damaged the lock on the door. The neighbor then heard two loud thuds against Father's garage door. He went outside, saw Mother sitting in a truck in Father's driveway, and approached just as she was preparing to ram into the garage door again. She drove away instead. Mother conceded at trial that she did the damage described and that it was not an appropriate way to handle her anger.

Four days later, Mother returned to Father's apartment to, according to her, retrieve her shampoo. He opened the door enough to tell her he was on the phone to the police and not to come in. According to Father, she barged in and locked herself in the bathroom. The police arrived,

and some forty-five minutes later, they escorted her out of the apartment.[5]

In some cases the best interest of the child is infused with the statutory offensive behavior, such as Mother's past actions in fighting with Father and smoking marijuana in front of her children, and there are instances where the offending behavior will demand termination of parental rights. *In re W.C.*, 98 S.W.3d 753, 765 (Tex.App.-Fort Worth 2003, no pet.). However, we note there are cases where the best interest determination must have a firm basis in facts standing apart from the offending behavior. *Id.* at 765–66. Although such behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere. *Id.* at 766. This case is not one where Mother's offending behavior, on its own, is egregious enough to warrant a finding that termination is in the children's best interest. *See id.* Accordingly, other independent facts must support the judge's best interest finding. *Id.*

■ While there is evidence in the record of Mother's poor parenting skills, poor decision making, and inadequate protection of the children in the past, the evidence is uncontradicted that Mother has done everything that CPS has required of her and more. *See id.* There is evidence CPS's goal initially was to reunite the family. After Mother and Father divorced, the goal became placing the toddler with Mother and the infant with Father. No significant event occurred between the time CPS planned to return the children to appellant and the time CPS sought termination of Mother's parental rights other

---

**5.** During this same time period, Father was indicted twice for burglary for breaking into Mother's house.

than her divorce from Father and Mother's move out of her brother's house and into a sparsely-furnished two-bedroom apartment CPS deemed "unsuitable." *See id.* The best interest standard does not permit termination merely because a child might be better off living elsewhere. *Id.* at 758. Termination should not be used to merely reallocate children to better and more prosperous parents. *Id.* The evidence shows Mother has made significant progress, improvements, and changes in her life. The evidence also shows Mother has attended 100 percent of her visits with her children, and she obviously cares for her children.

After reviewing all the evidence presented and mindful of the fact that we may not reweigh that evidence or reassess the credibility of the witnesses, we conclude the evidence is legally insufficient to support the best-interest finding. That is, viewing the evidence in the light most favorable to the finding, we conclude a reasonable fact finder could not form a firm belief or conviction that it is in the children's best interest that Mother's parental rights be terminated. *See C.H.*, 89 S.W.3d at 25; *W.C.*, 98 S.W.3d at 766. We sustain Mother's sixth issue. Because of our disposition of Mother's sixth issue, we need not address Mother's remaining issues.

We reverse the decree of termination and dismiss the suit affecting the parent-child relationship.