**AFFIRM; Opinion Filed May 14, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-20-01066-CV**

_____

**IN THE INTEREST OF S.B. AND K.B., CHILDREN**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-30056-2019**

## MEMORANDUM OPINION

Before Justices Schenck, Smith, and Garcia
Opinion by Justice Schenck

Mother appeals the trial court's decree terminating her parental rights to S.B. and K.B.[1] In four issues, she challenges the legal and factual sufficiency of the evidence to support the trial court's findings that (1) she failed to comply with the provisions of a court order;[2] (2) termination was in the children's best interest;[3] (3) she knowingly placed or allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being;[4] (4)

---

[1] Father's parental rights to the children were terminated in the same proceeding, but he does not appeal the termination order.

[2] *See* TEX. FAM. CODE § 161.001(b)(1)(O).

[3] *See* FAM. § 161.001(b)(2).

[4] *See* FAM. § 161.001(b)(1)(D).

she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being;[5] and (5) she constructively abandoned the children.[6] We affirm. Because the dispositive issues in this case are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.4.

## BACKGROUND

S.B. was born in 2010, and K.B. was born in 2015.

In April 2019, the Texas Department of Family and Protective Services (CPS, or the Department) received four referrals regarding Mother and Father. The referrals alleged concerns of drug usage and of the parents' ability to care for the children.[7] In response to those referrals, on April 17, 2019, a CPS investigator

---

[5] *See* FAM. § 161.001(b)(1)(E).

[6] *See* FAM. § 161.001(b)(1)(N).

[7] The April 15 referral alleged:
- 8-year-old S.B. and 3-year-old K.B. lived with Mother and Father, but the parents had verbally agreed the children would stay with Father because of Mother's substance abuse issues;
- law enforcement present on a disturbance call had arrested Father for possession of drug paraphernalia Father claimed belonged to Mother;
- Father had the appearance of using controlled substances and had admitted to using cocaine two years prior and medicinal marijuana at the time of the referral;
- Father had been arrested for possession of a controlled substance the week prior to the referral; and
- on February 13, Father had attempted to steal products from Wal-mart while K.B. was present but when chased by loss prevention, Father ran and left K.B. behind.

The first April 16 referral alleged:
- 8-year-old S.B. supervised 3-year-old K.B. on a weekly basis;
- both children appeared dirty most of the time;
- each parent accused the other of leaving the children unattended;
- "[s]eems to have been going on for at least the last 6 months [and] appears to be getting progressively worse";

–2–

contacted the family's neighbors, the principal at S.B.'s school, and Father and the children at a motel where Father stated they were living. Mother was not present at the motel, and Father indicated he did not know where she was and did not want anything to do with her. Father expressed concern about Mother using drugs to the investigator. The investigator also observed Father's behavior was erratic and "appeared to be of someone who was using," so she asked if he would take a drug test. Father refused. Because of the allegations of illegal controlled substance use and domestic violence, the instability of the parents, Father's refusal to take a drug test, Father's inability to identify another person with whom to place the children, and the investigator's concern that Father might leave the area,[8] the investigator removed the children from Father's custody.

---

- constant fighting in the home;
- Mother reported Father kicked her out and she appeared to be sleeping outside;
- police appeared to be called to home approximately once a month;
- Father was arrested day before; and
- reporter suspected family was "squatting" in the house and refusing to leave.

The second April 16 referral alleged:
- both parents were using drugs;
- Mother reported Father had been arrested the day before and that while he was arrested, drugs were noticed in his car;
- the family was transient and their lease had expired the day before;
- the family was believed to be squatting in the home;
- S.B. reported the family had slept out in a field;
- Father was currently staying in a hotel;
- Mother was currently staying with a neighbor;
- the children were moving between Father's hotel and the neighbor's house where Mother was staying; and
- Mother said she did not have any food or transportation.

[8] At trial, the investigator testified Father told her "he could move anywhere[,] . . . the kids weren't born in . . . or from Texas, . . . [s]o they don't really have any ties to stay here." The investigator later admitted her concern that Father might leave the area with the children was "not a legal reason for removal of children."

On April 18, 2019, CPS filed its original petition for protection of and temporary conservatorship of the children. That same day, the trial court appointed an attorney ad litem to represent the interests of Mother. Several days later, the investigator was able to locate Mother and to contact her via text messages. However, Mother refused to meet with the investigator, take a drug test, or arrange to visit the children.[9] On May 1, the trial court conducted an adversary hearing, after which Mother arrived at the courthouse and was served with notice of CPS's suit. *See* TEX. FAM. CODE § 262.201(a) (requiring full adversary hearing not later than 14th day after date child taken into possession by governmental entity).

Trial began on September 23, 2020. However, after Father became physically ill in the courtroom, the court continued trial until November 30, 2020. Although Father had been present at the hearing on September 23, he failed to appear on November 30. At the conclusion of the second day of trial, the court terminated the parental rights of both parents to both children. Only Mother appealed.

## DISCUSSION

### I. Termination of the Parent–Child Relationship

A court may terminate a parental relationship if it finds by clear and convincing evidence (1) one or more statutory grounds for termination and (2) that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2).

---

[9] The investigator admitted that she observed Mother speak to the children during one of Father's visits when she called Father and he passed the phone to the children.

–4–

Clear and convincing evidence is proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* § 101.007.

Here, the trial court found the Department had proven by clear and convincing evidence that Mother had

> knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger the physical or emotional well-being of the children; [Tex. Fam. Code § 161.001(b)(1)(D)]

> engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the physical and emotional well-being of the child [Tex. Fam. Code § 161.001(b)(1)(E)]

> constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and the department has made reasonable efforts to return the children to her, she has not regularly visited or maintained significant contact with the children, and she has demonstrated an inability to provide the children with a safe environment; [Tex. Fam. Code 161.001(b)(1)(N)] and

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children; [Tex. Fam. Code 161.001(b)(1)(O)][.]

The trial court also found that the termination of Mother's parental rights to the children was in the best interest of the children. *Id.* § 161.001(b)(2).

In her first three issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings pursuant to Section 161.001(b)(1)(D), (E), (O), and (N).

In reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a "firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

In a factual sufficiency review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

In addition to challenging the trial court's findings pursuant to Section 161.001(b)(1)(D), (E), (O), and (N), Mother challenges the trial court's finding that

termination of her parental rights is in the children's best interest. There is a strong presumption that the child's interest will be best served by remaining with a parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. FAM. § 263.307(a). Several statutory factors relevant to this appeal should be taken into account in evaluating a parent's willingness and ability to provide the child with a safe environment, including the child's age and vulnerabilities; results of psychological evaluations of the parents; whether there is a history of substance abuse by the child's family; the willingness and ability of the child's family to complete counseling services and to cooperate with an agency's close supervision; and the willingness and ability of the child's family to effect positive and personal changes within a reasonable period of time. *Id.* § 263.307(b)(1), (6), (8), (10), (11).

In addition to these statutory factors, we look to other non-exclusive factors relevant to the best-interest determination, including (1) the child's desires, (2) the child's present and future emotional and physical needs, (3) the present and future emotional and physical danger to the child, (4) the parent's parental abilities, (5) the programs available to assist a parent to promote the child's best interest, (6) the parent's plans for the child, (7) the stability of the home, (8) the parent's acts or omissions that may indicate the parent–child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367,

371–72 (Tex. 1976). A best-interest finding need not be supported by evidence of every *Holley* factor, particularly if there is undisputed evidence that the parental relationship endangered the child's safety. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence of Section 161.001(b)(1) termination grounds may also be probative of a child's best interest. *See id.* at 28.

## II. Endangerment to the Children

In her third issue, Mother challenges the legal and factual sufficiency to support the trial court's findings pursuant to subsections (D) and (E). When, as in this case, a trial court terminates a parent's rights based on section 161.001(b)(1)(D) or (E) and the parent challenges that finding on appeal, due process requires the appellate court to review the finding and detail its analysis even if it affirms the termination order based on other grounds under section 161.001(b)(1). *In re C.W.*, 586 S.W.3d 405, 406 (Tex. 2019) (per curiam).

Both subsections (D) and (E) require proof of endangerment. *See* FAM. § 161.001(b)(1)(D), (E). "Endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health, but it is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *See In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.) (citations omitted). The primary distinction between the two subsections is the source of the physical or emotional endangerment to the child. *Id.* Subsection (D) addresses the child's surroundings and environment while subsection (E) address parental misconduct.

*Compare* FAM. § 161.001(b)(1)(D), *with id.* § 161.001(b)(1)(E). Parental conduct, however, is also potentially relevant to the child's environment under subsection (D). *See In re J.D.B.*, 435 S.W.3d at 463. That is, conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *See id.* Inappropriate, abusive, or unlawful conduct by persons who live in the child's home is part of the "conditions or surroundings" of the child's home under subsection (D). *See id.*

A parent engaging in conduct that leads to the parent's imprisonment is also some evidence of endangerment. *In re N. G.*, No. 05-17-01255-CV, 2019 WL 4126496, at *5 (Tex. App.—Dallas Aug. 30, 2019, pet. denied) (mem. op. on remand). Although imprisonment, standing alone, does not constitute engaging in conduct which endangers the physical or emotional well-being of the child, it is a fact properly considered alongside other probative evidence of endangerment. *See In re L.E.H.*, No. 05-18-00903-CV, 2018 WL 6839565, at *5 (Tex. App.—Dallas Dec. 31, 2018, no pet.) (mem. op.). If the evidence, including imprisonment, proves a course of conduct that has the effect of endangering a child's physical or emotional well-being, a finding under subsection (E) is supportable. *Id.*

Similarly, evidence of a parent's drug usage, or evidence that another parent allowed a child to be in close proximity to persons using drugs, is evidence of endangerment. *See In re N. G.*, 2019 WL 4126496, at *5; *see also In re J.O.A.*, 283

S.W.3d 336, 345 (Tex. 2009) (holding parent's use of narcotics and its effect on his or her ability to parent may qualify as endangering course of conduct).

Domestic violence, want of self-control and propensity for violence may be also considered as some evidence of endangerment. *See In re C.E.K.*, 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet.). If a parent abuses or neglects the other parent or other children, that conduct may support a finding of endangerment under subsection (E). *See id.*

In this case, the Department presented evidence that both Mother and Father had abused drugs before the children were removed and during the pendency of this case and that illegal drug possession had led to their numerous arrests on numerous occasions.

On April 6, 2019, police pulled over a car driven by Father for an expired license plate. Ultimately, police arrested Father for possession of drug paraphernalia—a methamphetamine pipe—and possession of a controlled substance, specifically 2.7 grams of methamphetamine. A woman—not identified as Mother—was in the car as well and in possession of a marijuana pipe and an unspecified amount of marijuana.

On April 15, police responded to Mother's report of domestic disturbance. Upon arrival at the family's home, police observed Father exiting his pickup truck and carrying 3-year-old K.B. Father put K.B. down to talk to the police officers. One officer noticed a pipe sticking out of Father's back pocket. Father asked why

the officer was looking at his pocket then fled the scene, leaving K.B. behind in the process. The police captured Father and arrested him for possession of drug paraphernalia.

On April 16, 2019, police were called to the family's home where Father and two other men—Father's employer and a property management foreman for the construction company remodeling the home[10]—advised the responding police officer there were some "unidentified pills and possible drug paraphernalia located . . . inside the home." The police officer collected the pills as evidence, but no one was charged with possession of either the pills or the paraphernalia.

While this case was pending, Mother was arrested three times for possession of methamphetamine: on June 14, 2019; July 28, 2019, and March 10, 2020. During the few months she was on probation before trial, Mother only provided one successful drug test. The month before trial, when tested as part of her probation, Mother tested positive for methamphetamine use. Mother failed to submit to any required drug tests for the Department during the nineteen months the case was pending. At trial, the CPS caseworker testified that the Department had attempted to make it easier for Mother to submit to testing, including giving Mother the option

---

[10] According to a police officer who testified at trial, "The house had long been under construction or reconstruction, remodeling. And then know (sic) that [Father] and [Mother] were living there with their children in some aspect. And just know (sic) that we had been there numerous times. And the house seemingly was very slow and, you know, actually being remodeled." When asked about the nature of the previous calls to that home, the police officer testified, "they were usually disturbance calls or domestic-type situations."

to go to probation for the purposes of testing. Despite the foregoing evidence, Mother testified at trial she was not aware of any positive drug test results and that she did not believe she had a drug problem.

The Department also presented evidence Mother allowed the children to remain in a home where domestic violence was present. In November 2018, Father called the police to report he had been assaulted by Mother. When the police contacted Mother by telephone, she denied any assault and instead stated Father had locked her out of their house all night. Mother also stated she preferred the police contact her by telephone because the previous time the police had responded, she was arrested. On April 15, 2019, police responded to Mother's report of domestic disturbance. On April 17, Father reported to the Department that Mother was violent towards him and aggressive towards the children. The Department later conducted an interview at which S.B. confirmed Father's reports that he was the victim of domestic violence from Mother.

In addition to the foregoing evidence of Mother's and Father's multiple arrests, the Department presented evidence of Mother's and Father's imprisonment. At the time of the second day of trial in November 2020, Mother was serving probation sentences in two counties. Mother was in jail for approximately two weeks in June through July 2019, approximately a month in August through September 2019, and approximately four months March through July 2020. Father was also in jail for some period during the pendency of this case. Although the

record does not specify precisely when Father was jailed, he was released in April 2020 and not in jail during June through July of 2020.

Although Mother testified it had been several months since she had spoken with Father and testified she had no plans to reunite with him, she testified she would consider doing so "if somehow things could be rekindled and all bridges found amend somehow." She also admitted that the last conversation she had with Father was discussing "parenting the children together," which a fact-finder could interpret to mean that she had some intention of leaving the children in Father's care in the future.

The Department also presented evidence of the children's negative emotional health. A CASA volunteer testified as to having talked with S.B. about her memories of being left alone with her younger sibling and having "very much had a parental role" and that "it took her a long time to recognize that she shouldn't have that parental role." When the children were first removed, they struggled to process when they were angry, resulting in "outbursts." Additionally, "[K.B.] really had a hard time at that point, you know, expressing his emotions appropriately and handling his anger."

Finally, the Department presented evidence Mother failed to visit her children for more than six times during the nineteen months that the case was pending despite the Department offering her visits beginning when the children were removed in April 2019 and weekly after her release from jail in July 2020 through trial in

November 2020. In her brief, Mother argues the Department failed to present evidence of how many visits she missed or that she missed visits over any specified length of time. Mother also points to the evidence that she visited approximately five times and had difficulty with her electronic device that caused her to miss some visits. However, at trial, Mother testified that from the time the case began in April 2019 up until April 2020, she chose not to visit with her children. When asked why, she stated she disagreed with them being taken from her and that she could not bring herself to say goodbye to them. This testimony supports a finding of a voluntary, deliberate, and conscious course of conduct pursuant to subsection (E). *See In re C.R.*, 263 S.W.3d 368, 372 (Tex. App.—Dallas 2008, no pet.) (citing FAM. § 161.001(b)(1)(E)).

In her brief, Mother points to evidence that the children were fed, clothed, cleaned, that the school-aged child attended school regularly, and that the principal had no specific concerns regarding Mother's parenting or the school-aged child's safety. She also points to the May 13, 2019 family plan the State offered into evidence, which documents neither child had any emotional needs and that both were in great health. That same family plan outlines concerns about the parents creating an unsafe home environment for the children due to the "frequent incidents of domestic violence in the home" and both parents' illegal drug use.

Based on the foregoing evidence of Mother's conduct, including continued drug abuse, arrest for drug possession, imprisonment, and her deliberate, voluntary,

–14–

and conscious choice not to visit with her children for a calendar year, as well as evidence of Father's conduct in repeated arrests for drug possession and imprisonment, we conclude the record shows a voluntary, deliberate, and conscious course of conduct by Mother that endangered the children's emotional and physical well-being, as well as created an environment that similarly endangered the children.

As Mother points out, there is some evidence in the record to conclude one witness did not have any specific concerns regarding Mother's parenting or the school-aged child's safety and that both children were in great health a month after removal such that the fact that the children's physical and emotional well-being were endangered was disputed. However, in light of the entire record, we cannot conclude such evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction that the children's physical and emotional well-being were endangered by Mother's conduct and their environment created in part by her conduct. Therefore, we conclude the evidence is legally and factually sufficient to support the trial court's findings pursuant to Section 161.001(b)(1)(D) and (E). Because the evidence is legally and factually sufficient to support the endangerment findings, we need not address the findings on subsection (O) or (N). *See, e.g.*, *In re D.B.S.*, No. 05-20-00959-CV, 2021 WL 1608497, at *7 (Tex. App.—Dallas Apr. 26, 2021, no pet. h.) (mem. op.); *In re M.T.*, No. 05-20-00450-CV, 2020 WL 5887086, at *7 (Tex. App.—Dallas Oct. 5, 2020, no pet.) (mem. op.).

**III.  Termination in the Best Interest of the Children**

In her second issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights was in the children's best interest.

### A.  *Children's Desires*

The CASA volunteer testified the children desired to remain in the foster home they had lived in since January 2020.  However, the CASA volunteer conceded that he had not asked the children whether they would wish to maintain any contact with either Mother or Father.  While this evidence is hardly dispositive, it is consistent with the trial court's determination and the remaining evidence bearing upon the question of the children's best interests.

### B.  *Children's Physical and Emotional Needs*

The CASA volunteer testified regarding the children's need for therapy and a stable environment, that the children's current caregivers were committed to the children's ongoing therapy and that the children had grown emotionally and were able to process their feelings.  The CASA volunteer testified as to having spoken with S.B. about her memories of being left alone with her younger sibling and having "very much had a parental role" and that "it took her a long time to recognize that she shouldn't have that parental role."  When the children were first removed, they were not placed together.  In the second placement, they lived in a home with younger children, which they both struggled with in terms of "sharing their space

and kind of vying for attention." Additionally, "[K.B.] really had a hard time at that point, you know, expressing his emotions appropriately and handling his anger." As Mother pointed out above, the family plan admitted at trial indicated the children were in good health and had no emotional needs. On balance, this evidence does not indicate the children have greater than average physical needs but does indicate emotional needs that require ongoing therapy and support. Further, as there is at least some evidence these emotional needs were created by Mother's conduct and the environment the children had been in prior to placement, this evidence supports the trial court's best-interest finding.

C. *Present and Future Emotional and Physical Danger to the Children*

Despite having struggled with being placed in a home with younger children so much so they were removed to the current placement, the children related to the CASA volunteer they looked forward to their foster mother's new child being born. The CASA volunteer expressed concern that if the children were reunited with Mother and Father, S.B. would again feel compelled to take on a parental role and that Mother and Father would continue to engage in criminal activity. The CASA volunteer's concern appears to be well supported by Mother's and Father's recurring criminal activity during the pendency of this case, including Mother's positive drug tests and her simultaneous denial of any drug problem. Accordingly, this evidence tends to support the trial court's best-interest finding.

### D. *Mother's Parental Abilities*

Mother testified as to having completed parenting classes and reading parenting materials, but she provided no proof of same beyond her own testimony to the Department, despite that being one of the services she was required to complete. However, she chose not to talk to or otherwise visit the children for an entire year. The CPS investigator testified she had spoken with the parents' neighbors who had fed, bathed, and sheltered the children, but she testified the neighbors indicated they were not comfortable with the arrangement: "Mom would kind of show up and say, hey, we haven't eaten today. And can you feed us?" Thus, Mother took appropriate parental action in seeking—albeit reluctant—help to care for her children, but the CPS investigator also testified that the neighbors informed her Mother knew CPS had removed her children but did not attempt to contact CPS during the "couple days" it took for CPS to contact Mother.

S.B.'s principal testified that she had offered to contact CPS on behalf of Mother in response to Mother's complaints about fighting with Father and lack of access to the family home, and Mother refused that assistance. Additionally, there was evidence S.B. had been left alone with her younger sibling to such an extent that she felt she "very much had a parental role" and that "it took her a long time to recognize that she shouldn't have that parental role." On balance, this evidence tends to support the trial court's best-interest finding.

### E. Programs Available to Assist Mother

The record does not contain much evidence regarding this factor, other than testimony that CPS would assist Mother with drug testing. Accordingly, this factor does not weigh in support of the trial court's best-interest finding.

### F. Mother's Plans for the Children and Stability of Home and Proposed Placement

Mother was homeless and her plans consisted of the assistance of a longtime employer and friend with whom she had only begun speaking two weeks before the second day of trial. All she related this person could provide at that time was an unspecified place to live and an unspecified job. Mother indicated she did not have a permanent place to live or more than sporadic, part-time employment.

In contrast, the CASA volunteer testified as to the children's contentment with their foster family and fondness and familiarity with their foster parents' extended family. There was testimony that previous foster arrangements had not been successful, but that the current arrangement was desired by the children, and that they appeared to be doing well with their foster parents. The CPS caseworker testified the plan was for the current foster family to adopt the children and that such plan would be in the children's best interest. We conclude this factor supports the trial court's best-interest finding.

### G. Mother's Acts or Omissions and Excuses for Same

Mother frequently engaged in drug use but at trial denied any such problem. Mother was arrested numerous times and incarcerated several times during the

pendency of the case. At trial, she offered excuses of not being comfortable saying goodbye to her children, inadequate transportation, and financial resources for her failure to visit her children. However, despite being given multiple opportunities to improve her ability to visit with her children and to even establish her commitment to her own health and to her children's emotional health, she has failed to take advantage of any. She acknowledges Father's failings but muses she would consider reuniting with him under the right circumstances. Furthermore, she offered no family or friend as placement that passed CPS's review or whom she had communicated with in the previous decade. Accordingly, this factor supports the trial court's best-interest finding.

### H. Summary of Factors and Conclusion

To be sure, the conclusion as to whether termination is in the best of the child does not turn on proof of any unique set of factors, nor does it limit proof to specific factors. *See In re C.E.K.*, 214 S.W.3d 492, 498 (Tex. App.—Dallas 2006, no pet.). Undisputed evidence of only one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child; other cases, however, will present more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would, even as a whole, not suffice to uphold a finding that termination is required. *See id.* Here, viewing the entire record, we conclude sufficient evidence exists for a factfinder to have formed a "firm belief or conviction that [the trial court's best-interest] finding was true." *See In re J.F.C.*, 96

S.W.3d at 266. Thus, we conclude the evidence supporting the best-interest finding is legally sufficient. Additionally, we conclude the evidence is factually sufficient because we conclude the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that the trial court's best-interesting finding was true. *See id.*

Accordingly, we overrule Mother's second issue.

## CONCLUSION

We affirm the trial court's judgment.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

201066F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF S.B. AND K.B., CHILDREN

No. 05-20-01066-CV

On Appeal from the 199th Judicial District Court, Collin County, Texas Trial Court Cause No. 199-30056-2019.
Opinion delivered by Justice Schenck. Justices Smith and Garcia participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee recover its costs of this appeal from appellant.

Judgment entered this 14th day of May 2021.