Opinion issued December 3, 2009




 


 

 






In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-09-00173-CV

NO. 01-09-00390-CV

____________


DESHANN SMITH A/K/A CAJUANNA PETERSON, Appellant


V.


TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,
Appellee






On Appeal from the 314th District Court

Harris County, Texas

Trial Court Cause Nos. 2007-07944J & 2008-01367J







MEMORANDUM OPINION

 Following a bench trial, the trial court signed judgments terminating the parent-child relationship between appellant, Deshann Smith, (1) a/k/a Cajuanna Peterson, and
her children J.O., T.O., and N.S. (2) The trial court also appointed the Texas
Department of Family and Protective Services ("the Department") as sole managing
conservator of the three children. In this accelerated appeal, Smith challenges the
legal and factual sufficiency of the evidence supporting the trial court's findings
under Section 161.001. See Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2009). 
We affirm.

Background

 On September 12, 2007, the Department received a referral from the fire
department regarding Smith's minor children, J.O. and T.O., who were three-and-a-half and one-and-a-half years old at the time. The referral indicated that the fire
department was dispatched to Smith's apartment following a report that smoke was
emanating from the apartment unit. After getting no response from pounding on the
door, the fire department made a forced entry. Upon entering the apartment, the
firefighters observed smoke coming from the stove. The firefighters reported that the
apartment was filled with smoke and the smoke detector alarm was sounding. Smith
was found sleeping on a mattress and the children, J.O. and T.O., were sleeping on
the floor. The residence was described as filthy with food and trash on the floor
where the children were sleeping. There was no furniture in the apartment other than
the mattress on which the mother was sleeping and an air mattress in one of the
bedrooms. The fire department reported that the mother was taking Xanax at the time
of the fire.

 Atoya Eaden, an investigator from the Department, interviewed Smith later that
day. Smith told Eaden that she used Tofranil and Xanax for trouble with anxiety and
sleeping but claimed she never used illegal drugs. Regarding the kitchen fire, Smith
told Eaden that she was cooking beans and rice and went to sleep with the children. 
Smith stated she had not taken any of her medicines at the time. However, later she
admitted she was under the influence of Xanax at the time of the fire. When asked
about a burn mark found on J.O.'s buttocks, Smith told Eaden that J.O. got ahold of
a curling iron when he got out of the bathtub but stated that she did not know about
it because he never cried.

 The children were taken into the possession of the Department that same day
pursuant to Texas Family Code Section 262.104. See Tex. Fam. Code Ann. §
262.104 (Vernon 2008) ("Taking Possession of a Child in Emergency Without a
Court Order"). A hearing was held the next day, September 13, 2007, and the court
issued emergency temporary orders naming the Department temporary sole managing
conservator of the children. On September 27, 2007, the court held an adversary
hearing and again issued orders naming the Department temporary sole managing
conservator of the children. Also on September 27, 2007, Smith was ordered to take
a hair follicle drug test. The results of the test were positive for the presence of
benzoylecgonine (a metabolite of cocaine) and cocaine. 

 Department caseworker, Montoya Hunter, was assigned to the case. Hunter
testified at trial that the three children were currently placed in foster care and that,
in her opinion, it was in the best interest of the children to remain in foster care. 
Hunter stated that a service plan was prepared for Smith. As part of the plan, Smith
was asked to complete parenting classes, drug testing, psychological and psychiatric
evaluation, therapy, and random urinalysis testing. 

 On November 14, 2007, Smith submitted to a substance abuse evaluation by
Turning Point, a drug treatment facility. During the screening, Smith indicated that
in the past six months there had been instances when alcohol or drugs had kept her
from doing work, going to school, or caring for her children. Additionally, Smith
indicated that, in the past six months, her alcohol or drug use had caused an accident
or danger to herself or others. Smith told her interviewer that, at that time, she had
stopped taking Xanax medication because it made her fall asleep. Smith indicated
that she was not pregnant at that time. Smith stated that she received the majority of
her income from someone else, and that no persons relied on her for the majority of
their support.

 The service plan was filed with the court on November 15, 2007, and a status
hearing was held on November 20, 2007. At the status hearing, the court issued an
order, entitled "Additional Temporary Orders to Obtain Return of Children," which
ordered, among other things, that Smith "remain drug free," "complete a drug and
alcohol assessment and follow all recommendations of the drug and alcohol
assessment," "complete random drug tests, which may include a hair follicle test,"
refrain from engaging in criminal activity, maintain stable housing, maintain stable
employment, and complete all services outlined in the Department's service plan filed
with the court. At the November 20, 2007 hearing, the judge made findings that
Smith had reviewed and understood the service plan.

 On December 17, 2007, Smith submitted to a psychological evaluation. Smith
told psychologist, Mandi Norris, that at the time of the kitchen fire, she had taken a
prescribed sleeping pill for the first time while cooking and had fallen asleep. Smith
told the psychologist that she was prescribed Xanax and a sleeping medication but
that she stopped taking the medication after her children were removed from her care. 
Norris noted in her report that Xanax is a potentially habit-forming anxiolytic. Smith
reported that she was not employed at the time of her evaluation because she had been
laid off two or three weeks prior to the evaluation. During this evaluation she told
Norris that she was not pregnant at that time. Following the interview, Norris
concluded that Smith "is at risk for recurrent problems with substance abuse, and
these concerns are heightened by Ms. Smith testing positive for cocaine[.]" Norris
noted that Smith denied any illicit drug use other than cocaine on one occasion in
June or July 2007. However, Norris suggested the possibility that Smith minimizes
her substance abuse. Norris also indicated that Smith's results suggest that "Ms.
Smith put forth a guarded effort on self-report measures," and as a result, Smith's
evaluation report may not fully capture her condition. Norris also concluded in her
report that Smith had a "history of inappropriately using prescription medication
while her children were in her care." 

 Norris recommended that Smith undergo comprehensive substance abuse
evaluation, including random drug testing, to determine her need for substance abuse
treatment. Also, Norris recommended that Smith receive a psychiatric evaluation to
determine the appropriateness of her prescribed medication. In addition, Norris
recommended individual therapy, and if reunification of the children with Smith was
a goal, Norris also recommended family therapy. Smith attended one session of
individual therapy and did not attend her other scheduled sessions. The therapist
terminated Smith from services due to nonparticipation. 

 Smith participated in a psychiatric evaluation on January 29, 2008. The
psychiatrist concluded that Smith met the criteria for Major Depressive Disorder and
suggested Smith be prescribed an antidepressant and medication to help her sleep at
night. However, the psychiatrist stated that Smith should not be prescribed hypnotics
or benzodiazepines.

 On February 11, 2008, N.S. was born. On the same day the Department
received a referral that both Smith and her newborn, N.S., tested positive for
benzodiazepines. (3) Smith did not receive any prenatal care during her pregnancy. 
Hospital staff observed Smith taking pills not prescribed to her and sleeping for
hours. Smith admitted to using Xanax during her pregnancy, and she tested positive
for cocaine four-and-a-half months prior to the birth of N.S. The newborn, N.S.,
suffered mild withdrawal symptoms and mild shaking. 

 On February 15, 2008, the Department filed a suit affecting the parent-child
relationship (SAPCR) relating to N.S., requesting protection of the child,
conservatorship, and termination of parental rights. The court entered temporary
orders and appointed the Department as N.S's temporary managing conservator. The
court ordered that Smith comply with the Department's service plan to obtain the
return of N.S. (4) The order included requirements that Smith remain drug free,
complete a drug and alcohol assessment and follow all recommendations of the
assessment, "complete random drug tests, which may include a hair follicle test,"
refrain from engaging in criminal activity, maintain stable housing, maintain stable
employment, and complete all services outlined in the Department's service plan filed
with the court.

 Records from the drug treatment facility indicate that Smith was a "no-show"
for scheduled urinalysis testing on May 7, 2008 and June 11, 2008. On August 28,
2008, Smith was scheduled for a court ordered hair follicle and urine drug test but
refused to submit to either test. Smith refused the hair follicle test because she did
not want a bald spot but offered no explanation for her refusal to take the urine test. 
At trial, Smith claimed she was never told about a urinalysis. The testing center
reported the refusal to the court. Smith stated that she was aware that the court had
ordered her to submit to a drug test on that date.

 On December 4, 2008, J.O., T.O., and N.S. were placed together in a foster
home. Hunter, the Department caseworker, reported that the children were doing well
and bonding with their current caregiver. Hunter stated that she was hopeful that the
caregiver would adopt the children. Hunter opined that it would be in the children's
best interest to remain with the current placement because they were well cared for
and were in a safe, stable environment. 

 Smith waived trial by jury, and the Department's termination suit was tried to
the bench. At trial, the Department offered business records from the drug treatment
facility, the psychologist and psychiatrist who evaluated Smith, and the guardian ad
litem assigned to the children. The Department also offered the petitions, affidavits,
pleadings, and orders from the cases. The Department offered an order from a prior
case involving the Department and Smith. The record showed that in 2002, before
J.O., T.O., and N.S. were born, the Department took custody of five of Smith's
children, and the court ultimately issued an order appointing the paternal grandmother
as sole managing conservator of the five children.

 The Department offered certified copies of three separate judgments of
conviction for Smith. The records reflected that Smith had two convictions for
misdemeanor theft from May 2000 and June 2006, and a conviction for unauthorized
use of a motor vehicle from May 2002. Also, the Department offered certified copies
of two indictments, showing that at the time of trial, Smith was under indictment for
two alleged offenses. On September 2, 2008, Smith was alleged to have committed
the offense of theft of five bracelets. Approximately one week later, on September
10, 2008, Smith was alleged to have committed a robbery. According to the robbery
complaint, Smith went into a nail salon, told the employees she had a firearm, and
demanded money. Smith was incarcerated in early October 2008, while awaiting trial
on her criminal charges. At the time of the termination trial in February 2009, Smith
was still in jail awaiting her criminal trial. 

 At the termination trial, held on February 5, 2009, Hunter testified that Smith
did not complete her services that were ordered in the service plans filed in both
cases. Hunter said that Smith completed some parenting classes and underwent
psychological evaluation. However, following the psychological evaluation, the
psychologist recommended Smith participate in therapy. Smith only attended one
session of therapy. Hunter stated that, to her knowledge, Smith had not completed
her drug treatment program. Hunter noted that Smith did not refrain from engaging
in criminal activity, which was required by the court order and service plan. Hunter
stated that she did not believe Smith was capable of providing a safe environment for
the children because she was incarcerated, did not have a stable housing environment,
and did not have employment to provide for the children. Further, Hunter believed
terminating the parental rights of Smith was in the best interest of the children.

 The guardian ad litem for the children, Amelia Binkley, testified before the
court and recommended that it would be in the children's best interest to terminate
Smith's parental rights. Binkley submitted a report with her recommendations to the
court, which was admitted without objection. In her report, Binkley noted that Smith
made minimal progress with her service plans.

 Following trial, the court signed a decree terminating the parent-child
relationship between Smith and J.O., T.O., and N.S., and awarding the Department
sole managing conservatorship of the three children. In support of termination, the
judgment recites that the trial court found by clear and convincing evidence that
termination of the parent-child relationship between Smith and the children was in
the children's best interest. The judgment further recites that the trial court found by
clear and convincing evidence that Smith (1) engaged in conduct or knowingly placed
the children with persons who engaged in conduct which endangers the physical or
emotional well-being of the children; and (2) failed to comply with the provisions of
a court order that specifically established the actions necessary for the mother to
obtain the return of the children. No findings of fact or conclusions of law were
requested.

Sufficiency of the Evidence

 In three issues, Smith challenges the trial court's termination of her parental
rights on the grounds that the evidence is legally and factually insufficient to support
the trial court's finding that she engaged in conduct set out as grounds for termination
pursuant to Texas Family Code subsections 161.001(1)(E) and (O) and the trial
court's finding that termination was in the best interest of the children pursuant to
subsection 161.001(2). See Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2009).

Standard of Review

 Due process compels the heightened standard of clear and convincing evidence
to support decisions to terminate a parent-child relationship, as terminating the
parent-child relationship imposes permanent, irrevocable consequences. In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (citing Santosky v. Kramer, 455 U.S. 745, 759,
769-70, 102 S. Ct. 1388 (1982)). "'Clear and convincing evidence' means the
measure or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be established." Tex.
Fam. Code Ann. § 101.007 (Vernon 2008). This heightened burden of proof results
in a heightened standard of review. See In re J.A.J., 243 S.W.3d at 616 (stating that
"finding[s] that must be based on clear and convincing evidence cannot be viewed on
appeal the same as one[s] that may be sustained on a mere preponderance"). 

 When determining legal sufficiency, we review "all the evidence in the light
most favorable to the finding to determine whether a reasonable trier of fact could
have formed a firm belief or conviction that its finding was true." In re J.F.C., 96
S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's
conclusions, we must assume that the factfinder resolved disputed facts in favor of
its finding if a reasonable factfinder could have done so. Id. We disregard all
evidence that a reasonable factfinder could have disbelieved or found to have been
incredible. Id. This does not mean that we must disregard all evidence that does not
support the finding. Id. Disregarding undisputed facts that do not support the finding
could skew the analysis of whether there is clear and convincing evidence. Id. 
Therefore, in conducting a legal-sufficiency review in a parental-rights-termination
case, we must consider all of the evidence, not only that which favors the verdict. 
City of Keller v. Wilson, 168 S.W.3d 802, 817 (Tex. 2005). 

 In determining factual sufficiency under the clear-and-convincing burden, we
must consider whether the evidence is sufficient to produce a firm belief or
conviction in the mind of the factfinder as to the truth of the allegation sought to be
established. In re J.A.J., 243 S.W.3d at 616 (citing In re C.H., 89 S.W.3d 17, 25
(Tex. 2002)). We consider whether disputed evidence is such that a reasonable
factfinder could not have resolved that disputed evidence in favor of its finding. In
re J.F.C., 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence
that a reasonable factfinder could not have credited in favor of the finding is so
significant that a factfinder could not reasonably have formed a firm belief or
conviction, then the evidence is factually insufficient." Id.

 The natural rights that exist between parents and their children are of
constitutional dimension. Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). 
Therefore, termination proceedings should be strictly scrutinized, and the involuntary
termination statutes should be strictly construed in favor of the parent. Id. at 20-21. 
However, "[j]ust as it is imperative for courts to recognize the constitutional
underpinnings of the parent-child relationship, it is also essential that emotional and
physical interests of the child not be sacrificed merely to preserve that right." In re
C.H., 89 S.W.3d at 26. For parental rights to be involuntarily terminated, it must be
found by clear and convincing evidence that the parent engaged in conduct set out in
subsection 161.001(1) and that termination would be in the child's best interest
pursuant to subsection 161.001(2). Tex. Fam. Code Ann. § 161.001 (Vernon Supp.
2009). Both elements must be established, and termination may not be based solely
on the factfinder's determination of the best interest of the child. See Tex. Dep't of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re L.M., 104 S.W.3d
642, 646 (Tex. App.--Houston [1st Dist.] 2003, no pet.).

Grounds for Termination

 In terminating Smith's parental relationship with J.O., T.O., and N.S., the trial
court expressly found:


  that Smith engaged in conduct or knowingly placed the children with persons
who engaged in conduct which endangers the physical or emotional well-being
of the children, pursuant to Texas Family Code § 161.001(1)(E);

 that Smith failed to comply with the provisions of court orders that specifically
established the actions necessary for the mother to obtain the return of the
children . . . pursuant to Texas Family Code § 161.001(1)(O); and

 that termination of parental rights is in the best interest of the children.


 

 In her first three issues, Smith challenges the legal and factual sufficiency of
these findings.

A. Endangerment

 1. Legal Sufficiency

 We begin by considering the legal sufficiency of the trial court's finding of
endangerment grounds under Section 161.001(1)(E). To terminate a parent-child
relationship based on Section 161.001(1)(E), the trial court must find by clear and
convincing evidence that the parent "engaged in conduct or knowingly placed the
child with persons who engaged in conduct which endangers the physical or
emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(E) (Vernon
Supp. 2009). "To endanger" means to expose a child to loss or injury or to jeopardize
a child's emotional or physical health. Robinson v. Tex. Dep't of Prot. & Reg. Servs.,
89 S.W.3d 679, 686 (Tex. App.--Houston [1st Dist.] 2002, no pet.) (citing Tex.
Dep't of Human Servs. v. Boyd, 727 S.W.2d at 533). The term means "more than a
threat of metaphysical injury or the possible ill effects of a less-than-ideal family
environment." Boyd, 727 S.W.2d at 533. However, danger to a child need not be
established as an independent proposition and may be inferred from parental
misconduct even if the conduct is not directed at the child and the child suffers no
actual injury. Id. The relevant inquiry is whether evidence exists that a parental
course of conduct endangered the child's physical or emotional well-being. In re
R.D., 955 S.W.2d 364, 368 (Tex. App.--San Antonio 1997, pet. denied). The
conduct does not have to occur in the presence of the child. Dir. of Dallas County
Child Prot. Servs. v. Bowling, 833 S.W.2d 730, 733 (Tex. App.--Dallas 1992, no
writ). And the conduct may occur before the child's birth and both before and after
the child has been removed by the Department. See In re S.M.L.D., 150 S.W.3d 754,
757-58 (Tex. App.--Amarillo 2004, no pet.); Avery v. State, 963 S.W.2d 550, 553
(Tex. App.--Houston [1st Dist.] 1997, no writ). 

 The failure to provide appropriate medical care for a child may also be
considered conduct that endangers a child. In re D.E., 761 S.W.2d 596, 600 (Tex.
App.--Fort Worth 1988, no writ). This is true even if the parent did not cause the
condition that requires medical treatment. In re S.H.A., 728 S.W.2d 73, 88 (Tex.
App.--Dallas 1987, writ ref'd n.r.e.); Juan A___ v. Dallas County Child Welfare, 726
S.W.2d 241, 244 (Tex. App.--Dallas 1987, no writ) (mother's failure to obtain
medical treatment for child with severely burned feet constituted conduct endangering
child's physical well-being).

 A parent's consistent failure to take advantage of many forms of assistance
made available to her to help provide safe and stable living conditions for her
children may warrant termination of parental rights. Phillips v. Tex. Dep't of Prot.
& Reg. Servs., 25 S.W.3d 348, 352-55 (Tex. App.--Austin 2000, no pet.). 
Endangerment can be found where a parent fails to make improvements to poor living
conditions and fails to keep appointments designated to help her improve the
environment. In re M.H., 745 S.W.2d 424, 428-29 (Tex. App.--Houston [14th Dist.]
1988, no writ.). 

 Mere imprisonment will not, standing alone, constitute engaging in conduct
that endangers the physical or emotional well-being of a child. See Boyd, 727 S.W.2d
at 533-34. However, when all of the evidence, including imprisonment, shows a
course of conduct that has the effect of endangering the physical or emotional
well-being of the child, a finding under Section 161.001(1)(E) is supportable. Id. at
533-34. If the imprisonment of the parent displays a voluntary, deliberate and
conscious course of conduct, it qualifies as conduct that endangers the child. See
Avery, 963 S.W.2d at 553. 

 In her appellate brief, Smith acknowledges that "the undisputed evidence
established that on September 12, 2007, Appellant fell asleep with J.O. and T.O.
while something was left on the stove." Further, she recognizes that "[u]ndeniably,
this act had the potential to expose the children to harm or injury." However, Smith
argues that this is merely one incident, and subsection (E) requires evidence that the
parent is engaging in a course of conduct which endangers the physical or emotional
well-being of the child. With respect to N.S., Smith acknowledges that the
undisputed evidence establishes that Smith and N.S. tested positive for
benzodiazepine at the time of N.S.'s birth. Smith also claims in her brief that it was
undisputed that Smith was prescribed this medication. Smith argues that the record
does not contain any expert evidence relating to how the drugs endangered N.S., and
the Department had the burden of proving by expert testimony that taking the drugs
while pregnant is an endangering act.

 Smith's argument on appeal treats the above mentioned incidents as if they
were isolated. However, Smith has a pattern of endangering behavior. Smith's
contention that "undisputed evidence establishes . . . that Appellant was prescribed
[benzodiazepine]" is a misstatement of the record. Rather, Smith's own statements
and testimony are the only evidence that indicates she was prescribed the medication. 
During Smith's evaluation at the drug treatment facility and psychological evaluation,
she told staff that she stopped taking Xanax after her children were taken from her
custody. Following a psychiatric evaluation, the psychiatrist concluded that Smith
should not be using benzodiazepine. And the treating physician who delivered N.S.
stated that Smith was taking medicines not prescribed to her. At trial, the caseworker
assigned to the case, Montoya Hunter, testified that she was not aware of any
prescription for benzodiazepine written for Smith. 

 The physician who delivered N.S. noted that Smith received no prenatal care
during her pregnancy. Although Smith was evaluated by service providers several
times between the months of September and N.S.'s birth in February, Smith never
indicated to any of the health care professionals that she was pregnant. On November
14, 2007, less than three months before the birth of N.S., Smith told her evaluator that
she was not pregnant. Again, on December 17, 2007, during her psychological
evaluation with Mandi Norris, Smith told Norris that she was not pregnant. That
evaluation was less than two months before the birth of N.S. Despite the availability
of free treatment and care provided by the Department, the record shows no indication
that Smith told anyone she was pregnant. Rather, Smith affirmatively stated that she
was not pregnant when she was evaluated by two service providers less than three
months before the birth of her child. Because she affirmatively concealed the fact
that she was pregnant during her substance abuse evaluation and psychological
evaluation, she prevented the evaluators from considering her pregnancy when
making their recommendations. Smith's failure to disclose her pregnancy and failure
to receive any prenatal care indicate endangerment of N.S., particularly since Smith
was taking drugs during this time. See In re D.E., 761 S.W.2d 596, 600 (Tex.
App.--Fort Worth 1988, no writ) (failure to provide appropriate medical care may be
considered conduct that endangers a child).

 The record reflects Smith's incarceration on multiple occasions, including the
four months preceding the termination trial. Specifically, Smith was sentenced to 10
days in jail to begin May 8, 2000; 6 months in jail to begin May 8, 2002; and 20 days
in jail to begin June 22, 2006. Conduct that routinely subjects a child to the
probability that the child will be left alone because a parent is jailed endangers both
the physical and emotional well-being of the child. See In re S.D., 980 S.W.2d 758,
763 (Tex. App.--San Antonio 1998, pet. denied).

 The Department offered proof of Smith's prior convictions and two recent
indictments, showing her ongoing criminal history. The court ordered Smith to
refrain from criminal activity as a condition to obtain the return of her children. Even
though Smith was aware that the return of her children was conditioned on refraining
from criminal activity, she was indicted for two offenses during the time she was
supposed to be proving herself capable of providing her children with a safe and
stable home.

 The trial court heard evidence that Smith tested positive for cocaine during a
drug screening in September 2007. Additionally, Smith was a "no show" to
mandatory drug testing as part of her drug treatment program and also refused to take
at least one drug test ordered by the court. Smith testified that she was aware she was
required to take the drug test and that she was aware of the consequences. A court
may infer from a refusal to take a court-ordered drug test that parent was using drugs. 

In re K.C.B., 280 S.W.3d 888, 895 (Tex. App.--Amarillo 2009, pet. denied). 
Because it exposes the child to the possibility that the parent may be impaired or
imprisoned, illegal drug use may support termination under Section 161.001(1)(E). 
See Vasquez v. Tex. Dep't of Prot. & Reg. Servs., 190 S.W.3d 189, 195-96 (Tex.
App.--Houston [1st Dist.] 2005, pet. denied) (terminating parental rights despite
there being no direct evidence of parent's continued drug use actually injuring child). 
 The evidence presented with respect to Smith's pattern of crime, imprisonment,
and drug use demonstrates a deliberate course of conduct from which a rational trier
of fact could have found that Smith endangered her children's emotional and physical
well-being. When viewed in the light most favorable to the judgment, we hold that
the evidence was legally sufficient to support the trial court's finding that Smith
engaged in a deliberate course of conduct that endangered J.O., T.O., and N.S. under
Section 161.001(1)(E).


 2. Factual Sufficiency

 In conducting our factual-sufficiency review, we must ascertain what disputed
evidence, if any, exists as to the conduct in question. In re J.W., 152 S.W.3d 200, 206
(Tex. App.--Dallas 2004, pet. denied). Smith did not dispute her prior convictions,
that she was incarcerated at the time of trial, her cocaine use in 2007, her continuous
use of prescription drugs, or her history of involvement with the Department relating
to her five older children. 

 While Smith admits that she and N.S. tested positive for benzodiazepine at
N.S.'s birth, she argues on appeal that it is undisputed that the drug was prescribed
to her. Further, she argues that no testimony was offered or adduced at trial to
establish how much Xanax Smith took, whether that dosage was potentially harmful
to N.S., whether N.S. did, in fact, suffer any harm, and whether Smith was warned
that taking Xanax while pregnant could expose N.S. to danger. Smith contends that
"DFPS had the burden of providing such expert testimony to establish that Appellant
did intentionally expose N.S. to physical harm."

 Again, Smith misstates the record. Evidence was adduced at trial that the drugs
were not prescribed to her and that she was misusing prescription medication. While
her children were in her care, she slept through a smoke alarm that alerted when she
left a pot on a hot stove. The psychiatrist who evaluated Smith concluded that Smith
should not be prescribed benzodiazepines. In evaluations with a drug treatment
center and a psychological evaluation, Smith said that she stopped using Xanax after
her children had been taken out of her custody in September 2007. However, the
doctor who delivered N.S. in February 2008, reported that Smith was seen taking
prescriptions that were not prescribed to her and sleeping for hours. The doctor also
reported that N.S. was born with symptoms of withdrawal and mildly shaking.

 Furthermore, there is evidence that Smith denied being pregnant when she was
evaluated by health care professionals. Smith argues on appeal that the Department
had the burden to produce evidence that "Appellant was warned that taking Xanax
while pregnant could expose N.S. to danger." However, there is evidence in the
record that Smith affirmatively denied being pregnant. Further, Smith's argument that
the Department had the burden of showing that she "intentionally expose N.S. to
physical harm" misstates the law. Under the grounds for termination under
subsection (E), there must be clear and convincing evidence that the parent engaged
in conduct, or knowingly placed the child with persons who engaged in conduct, that
endangered the child's physical or emotional well-being. Tex. Fam. Code Ann. §
161.001(1)(E) (Vernon Supp. 2009). It is not necessary to establish that a parent
intended to endanger a child in order to support termination of the parent-child
relationship under subsection (E). See In re M.C., 917 S.W.2d 268, 270 (Tex. 1996)
(holding that neglect, even in the absence of physical abuse, may endanger a child's
physical or emotional well-being); Carter v. Dallas County Child Welfare Unit, 532
S.W.2d 140, 142 (Tex. Civ. App.--Dallas 1975, no writ) (terminating parental rights
based on endangering conduct resulting from the parent's mental incompetence and
mental illness).

 Smith maintains that she only used cocaine once in June or July of 2007. 
However, she was a "no show" to scheduled appointments for drug testing at her drug
treatment facility and refused to submit to a court-ordered test on at least one
occasion. Also, a psychologist who interviewed Smith indicated she felt Smith was
minimizing her drug usage. A rational trier of fact could have inferred from Smith's 
refusal to take a court-ordered drug test that she was using drugs. See In re K.C.B.,
280 S.W.3d at 895. Further, a rational trier of fact could have disbelieved Smith's
testimony that she only used illegal drugs once. Viewing the evidence as a whole, a
rational trier of fact could have reasonably formed a firm belief or conviction that
Smith had engaged in conduct that endangered the physical or emotional well-being
of J.O., T.O., and N.S. Thus, the evidence is factually sufficient to support the trial
court's finding on the section 161.001(1)(E) ground. 

 We overrule Smith's first issue.

B. Failure to Comply with Court Order

 In her second issue, Smith asserts that the evidence is legally and factually
insufficient to support the trial court's finding that Smith engaged in conduct pursuant
to subsection 161.001(1)(O). Because we conclude that the evidence is both legally
and factually sufficient to support the trial court's finding under Section
161.001(1)(E), and because a finding as to any one of the acts or omissions
enumerated in Section 161.001(1) is sufficient to support termination, we need not
address Smith's second issue challenging the trial court's findings under Section
161.001(1)(O). See Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2009); Tex. R.
App. P. 47.1.

 We overrule Smith's second issue.

C. Best Interest of the Child

 In her final issue, Smith challenges the legal and factual sufficiency of the trial
court's finding, pursuant to Section 161.002(2), that termination was in J.O., T.O.,
and N.S.'s best interest. See Tex. Fam. Code Ann. § 161.001(2) (Vernon Supp.
2009).

 A strong presumption exists that a child's best interests are served by
maintaining the parent-child relationship. In re L.M., 104 S.W.3d 642, 647 (Tex.
App.--Houston [1st Dist.] 2003, no pet.). However, while parental rights are of
constitutional magnitude, they are not absolute. See In re C.H., 89 S.W.3d 17, 26
(Tex. 2002). Just as it is imperative for courts to recognize the constitutional
underpinnings of the parent-child relationship, it is also essential that emotional and
physical interests of the child not be sacrificed merely to preserve that right. Id. 

 In Holley v. Adams, the Texas Supreme Court provided a nonexclusive list of
factors that the trier of fact in a termination case may use in determining the best
interest of the child. 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include (1)
the desires of the child; (2) the emotional and physical needs of the child now and in
the future; (3) the emotional and physical danger to the child now and in the future;
(4) the parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the child; (6) the
plans for the child by these individuals or by the agency seeking custody; (7) the
stability of the home or proposed placement; (8) the acts or omissions of the parent
that may indicate that the existing parent-child relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent. Id. These factors are not
exhaustive, and there is no requirement that the Department prove all factors as a
condition precedent to parental termination. In re C.H., 89 S.W.3d at 27; Adams v.
Tex. Dep't of Fam. & Prot. Servs., 236 S.W.3d 271, 280 (Tex. App.--Houston [1st
Dist.] 2007, no pet.). 

 The same evidence of acts or omissions used to establish grounds for
termination under section 161.001(1) may be probative in determining the best
interests of the child. In re C.H., 89 S.W.3d at 28; L.M., 104 S.W.3d at 647. Evidence
of just one factor may suffice as support of a finding that termination is in the best
interest of the child. See In re C.H., 89 S.W.3d at 27. However, termination of the
parent-child relationship is not justified when the evidence shows merely that a
parent's failure to provide a more desirable degree of care and support of the child is
due solely to misfortune or the lack of intelligence or training, and not to indifference
or malice. Clark v. Dearen, 715 S.W.2d 364, 367 (Tex. App.--Houston [1st Dist.]
1986, no writ). 

 1. The desires of the child 

 At trial, N.S. was less than a year old and, thus, too young to express her
desires. However, there is no reason to believe that N.S. has any conscious knowledge
of Smith, because the Department took custody of her just after she was born after she
tested positive for drugs. Similarly, no evidence was presented at trial that J.O. or
T.O. desired to be with their mother. The guardian ad litem appointed for the
children visited with the children on several occasions and noted that the children
appeared to be bonded with their foster parents. 

 2. The child's physical and emotional needs, now and in the future

 The goal of establishing a stable, permanent home for a child is a compelling
state interest. In re C.E.K., 214 S.W.3d 492, 498 (Tex. App.--Dallas 2006, no pet.). 
While Smith testified at trial that she had a stable job, the evidence adduced at trial
showed that she told the drug treatment center and the psychologist she was
unemployed and gave different stories to each. Additionally, Smith testified at trial
that she had been able to maintain stable housing that she paid for on her own, but
later on cross-examination, she admitted that she was living with a fiancé who paid
some of her expenses. Hunter, the caseworker, testified at trial that Smith told her she
was living with her boyfriend. Smith also gave a different story to the psychologist,
who reported that Smith told her she received the majority of her income from
another person and lived in an apartment paid for by her mother. For the four months
leading up to trial, Smith maintained no housing or employment because she was
incarcerated awaiting trial on criminal charges. From the evidence, a rational trier of
fact could conclude that Smith has not shown the ability to maintain stable housing
or employment. Additionally, evidence was presented at trial that Smith did not
comply with the Family Service Plan implemented by the Department. While Smith
argues that she was unable to complete the plan because it was unclear or the
Department did not properly order the services, other evidence suggests Smith
understood the plan and had experience dealing with the Department.

 Hunter, the Department casework, testified that T.O. had a speech problem, and
T.O. was being evaluated and treated by the Early Childhood Intervention program. 
Hunter testified that J.O. had anger problems and was very aggressive towards
strangers. At the time of trial, N.S. was about to be a year old, and Hunter testified
N.S. was not walking or talking yet.

 Smith's inability to provide a stable home, to remain gainfully employed, or to
comply with her court-ordered service plan, taken together with Smith's drug use and
criminal activity, supports the trial court's finding that Smith has not been and would
not be able to provide for J.O., T.O., or N.S.'s emotional or physical needs.

 3. The emotional and physical danger to the child, now and in the future

 The evidence regarding endangerment, discussed in support of the trial court's
finding under section 161.001(1)(E) above, is also probative of a finding as to danger
in determining the child's best interest. See In re C.H., 89 S.W.3d at 28. 

 While J.O. and T.O. were living with Smith, she caused a kitchen fire which
could have killed the children. She started cooking on the stove after taking sleeping
medication. She was found asleep on a mattress, despite the fire alarm that was
sounding, the smoke that filled the apartment, and the fire department breaking down
the door. Smith argues that the medication was prescribed to her. But even if she
was taking the medicine as prescribed, she fails to explain why she took sleeping
medication and lay down on a mattress, while she was cooking on the stove, leaving
her small children unsupervised in the apartment. 

 Additionally, the evidence showed that J.O. had a burn mark on his buttocks. 
Smith explained that he got the mark when he got out of the bathtub and burned
himself with her curling iron. Smith never provided an explanation for why she left
the child alone with a hot curling iron. Smith also never cared for or sought medical
treatment for J.O.'s burn.

 Smith's failure to obtain prenatal care at any time during her pregnancy with
N.S. demonstrates her complete disregard for the health of her child. Smith told her
drug evaluator on November 14, 2007, less than three months before N.S.'s birth, that
she was not pregnant. Similarly, she told Norris, the psychologist, she was not
pregnant in December 2007, less than two months before N.S.'s birth.

 4. Programs available to assist parents in promoting the child's best
interests


 Individual therapy, group therapy, and family therapy were offered to Smith,
but she only attended one individual session. Smith attempts to excuse her failure to
attend by saying that the order of the court was unclear. However, the therapy was
also an element of her service plan, which was ordered by the court. Additionally,
status hearings held periodically throughout the pendency of the case stated in bold
print the services that Smith failed to complete. While the Department designed a
plan to help Smith make the necessary changes to be a suitable parent to her children,
she failed to take advantage of the services. 

 5. The stability of the home or proposed placement

 When a prospective adoptive parent is standing in the wings, ready and willing
to adopt the child, courts are more likely to find that termination is in the child's best
interest. See Taylor v. Tex. Dep't of Prot. & Reg. Servs., 160 S.W.3d 641, 656 (Tex.
App.--Austin 2005, pet. denied).

 The Department caseworker, Hunter, testified that J.O., T.O., and N.S. were
thriving in their current placement and had bonded with their caregivers. Hunter
stated she was hopeful that the children's caregiver would adopt the children. Hunter
said that the placement home seemed safe and appropriate and that all of the
children's needs were being met and would be met in the future. 

 Evidence was introduced at trial that Smith would not provide a stable home
for the children. Hunter opined that Smith would not be able to provide the children
with a safe environment, explaining that Smith had been incarcerated, did not have
stable housing, and did not have employment to provide for the children. 

 6. Parent's acts or omissions that indicate the current parent-child
relationship is improper


 As discussed above, Smith put both J.O. and T.O. in danger when she caused
a kitchen fire and her drug-induced state prevented her from noticing the smoke
filling the apartment or fire alarm sounding. Additionally, Smith used cocaine and
prescription drugs during her pregnancy with N.S., did not obtain prenatal care, and
there is no evidence that she disclosed that she was pregnant to any of the health care
professionals she visited as part of her family service plan. Despite the services
offered by the Department to help Smith become a suitable parent for the children,
Smith continued her pattern of drug use and crime. Smith has eight biological
children, none of which she has parented. 

 7. Parent's excuses for those acts or omissions


 A parent's lack of education, training, or misfortune is considered under this
category of excuses, but does not negate evidence tending to show that termination
is in the child's best interest. In re S.H.A., 728 S.W.2d at 89-90.

 Smith was ordered to comply with a service plan that was designed to provide
her with the necessary assistance to overcome her problems and enable her to provide
her children with a safe, stable, nurturing environment. Additionally, the court
entered orders conditioning the return of her children on her compliance with the
provisions in the order. Smith did not comply with her service plan or the order. 
Although she alleges on appeal that the service plan was unclear, the trial court made
a finding that she reviewed and understood the service plan. Further, prior to these
cases, Smith had five children taken from her custody, so she is familiar with this
process. 

 While Smith offers explanations for why she did not comply, none explain why
she failed to make efforts to become a suitable parent to her children. Smith was
aware that the return of her children was conditioned on her completing court ordered
drug testing, and she refused to submit to the court ordered hair follicle drug test
because she did not want to have a "bald spot." 

 In light of all of the evidence, the trial court could have reasonably formed a
firm belief or conviction that termination of Smith's parental rights was in J.O., T.O.,
and N.S.'s best interest. Accordingly, we hold that the evidence is both legally and
factually sufficient to support the trial court's finding that termination of Smith's
parental rights was in the best interest of the children. 

 We overrule Smith's third issue.

Conclusion

 We affirm the judgment of the trial court.

 

 

 George C. Hanks, Jr.

 Justice


Panel consists of Justices Keyes, Hanks, and Bland.
1. In appellant's brief, she lists her name as "Deshanna Smith." However, we note that all
materials from the trial court, including the decrees of termination, refer to her as "Deshann
Smith." We refer to her as "Deshann" to be consistent with the judgment of the trial court
and notice of appeal.
2. The trial court also terminated the parental rights of Troy O'Neil and the unknown father of
N.S. However, they are not parties to the appeal.
3. At trial Smith stated that benzodiazepine was the drug used in Xanax. 
4. The service plan contained essentially the same requirements as the service plan in the case
involving J.O. and T.O.