**REVERSED AND RENDERED IN PART, AFFIRMED IN PART, AND REMANDED and Opinion Filed February 6, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-19-00844-CV
_____

### IN THE INTEREST OF G.A.L., A CHILD

**On Appeal from the 196th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 85844**

## MEMORANDUM OPINION

Before Justices Whitehill, Partida-Kipness, and Pedersen, III
Opinion by Justice Whitehill

Mother appeals an order terminating her parental rights over her daughter, G.A.L. She argues in two issues that the evidence was insufficient to support the trial court's findings that (i) termination was in G.A.L.'s best interest and (ii) Mother failed to comply with a court order under the circumstances specified in Family Code § 161.001(b)(1)(O). Mother does not challenge the trial court's order naming the Texas Department of Family and Protective Services as G.A.L.'s permanent managing conservator.

Parental rights are fundamental rights. Texas courts do not terminate parental rights because (i) the parent is economically disadvantaged or (ii) the child might be better off living elsewhere. Moreover, in addition to a requisite statutory ground, the petitioner must prove by clear and convincing evidence that terminating the relationship for permitted reasons is in the child's

best interest. That standard requires the petitioner to prove its case with more than "paltry" evidence.

Here, we must determine whether there was more than paltry evidence that terminating Mother's parental rights at this time was in G.A.L's best interest for reasons other than that Mother is economically disadvantaged or that the child might be better off living elsewhere. Because the evidence is legally insufficient to do so in this particular case under the heightened standard of review, we reverse the trial court's order and remand the case for further proceedings

## I.  BACKGROUND

In August 2017, the Texas Department of Family and Protective Services filed an original petition seeking to terminate Mother's and Father's parental rights as to G.A.L., a female infant.

After a six-day bench trial stretching over four months, the trial court issued a letter stating that both parents' rights were terminated and setting forth the supporting reasons. Although Mother attempted to appeal the letter ruling, we determined that this was not a final, appealable judgment. Then the trial judge signed an order terminating both parents' parental rights and appointing the Department as G.A.L.'s permanent managing conservator. Mother's premature notice of appeal then became proper. Father did not appeal.

## II.  ANALYSIS

We opt to address Mother's second issue first.

**A.    Issue Two:  Was the evidence legally or factually insufficient to support the trial court's finding that Mother violated a court order under the circumstances specified in Family Code § 161.001(b)(1)(O)?**

We do not reach the substantive merits of this issue because any error was harmless.

A trial court may terminate a parent's rights if it finds by clear and convincing evidence (i) one or more predicate acts or omissions defined in Family Code § 161.001(b)(1)(A)–(U) and (ii) that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b).

–2–

Here, the trial court found two predicates against Mother: § 161.001(b)(1)(L) and § 161.001(b)(1)(O). But on appeal Mother challenges only the (O) finding. Because she does not challenge the (L) finding, any error in the (O) finding is harmless because the (L) finding would still support the judgment. *See In re C.A.*, No. 05-18-00645-CV, 2018 WL 5905634, at *2 (Tex. App.—Dallas Nov. 12, 2018, no pet.) (mem. op.); *In re A.H.J.*, No. 05-15-00501-CV, 2015 WL 5866256, at *9 (Tex. App.—Dallas Oct. 8, 2015, pet. denied) (mem. op.). Accordingly, we overrule Mother's second issue.

**B.    Issue One:  Was the evidence legally or factually insufficient to support the trial court's finding that terminating Mother's parental rights was in G.A.L.'s best interest?**

Yes, the evidence was legally insufficient to support the trial court's best interest finding because (i) ignoring, as we must, the evidence that Mother is economically disadvantaged, the State's evidence regarding the best interest factors was paltry, (ii) there was substantial undisputed contrary evidence that the trial court could not reasonably disregard, and (iii) based on the foregoing, no reasonable factfinder could form a firm belief or conviction that terminating Mother's parental rights was in G.A.L.'s best interest.

**1.    Standard of Review**

Because terminating parental rights implicates fundamental interests, the clear and convincing standard of proof applies in termination cases. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *see also In re C.V.L.*, No. 05-19-00506-CV, 2019 WL 6799750, at *6 (Tex. App.—Dallas Dec. 13, 2019, no pet. h.) (because parental rights are fundamental and have constitutional dimensions, "involuntary parental termination must be strictly scrutinized"). "Clear and convincing evidence" is the measure or degree of proof that will produce in the factfinder's mind a firm belief or conviction as to the truth of the matter to be proved. FAM. CODE § 101.007.

Our standards of review reflect the elevated standard of proof. *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.). In both legal and factual sufficiency review, we consider all the evidence and defer to the factfinder's determinations as to witness credibility. *Id.*

In a legal sufficiency review, we credit evidence that supports the verdict if a reasonable factfinder could have done so, and we disregard contrary evidence unless a reasonable factfinder could not have done so. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). However, we do not disregard undisputed facts that do not support the verdict, because doing so could skew the analysis of whether there is clear and convincing evidence. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under the clear and convincing evidence standard, "even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true." *In re K.M.L.*, 443 S.W.3d at 113. If no reasonable factfinder could form a firm belief or conviction that the matter to be proven is true, the evidence is legally insufficient. *Id.*

In a factual sufficiency review, we likewise determine whether the factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re A.B.*, 437 S.W.3d at 502. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* at 503 (quoting *In re J.F.C.*, 96 S.W.3d at 266). We must undertake an exacting review of the entire record with a healthy regard for the constitutional interests at stake. *Id.* However, our review "must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

## 2.      Applicable Law

The trial court may terminate the parent–child relationship if the factfinder finds by clear and convincing evidence that (i) the parent committed one or more acts or omissions enumerated in Family Code § 161.001(b)(1) and (ii) termination is in the child's best interest.  FAM. CODE § 161.001(b).

A court may not make a finding under § 161.001(b) and terminate a parent's rights based on evidence that the parent is economically disadvantaged.  *Id.* § 161.001(c)(2).

Although there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest.  *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

The supreme court has identified a nonexclusive list of factors that may be relevant to a best-interest determination, depending on the facts: (i) the child's desires, (ii) the child's current and future emotional and physical needs, (iii) current and future emotional and physical dangers to the child, (iv) the parental abilities of those seeking custody, (v) the programs available to help those individuals promote the child's best interest, (vi) those individuals' plans for the child, (vii) the home's or proposed placement's stability, (viii) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one, and (ix) any excuse for the parent's acts or omissions.  *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

An absence of evidence of some *Holley* factors does not preclude a finding that termination is in the child's best interest, particularly if undisputed evidence shows that the parental relationship endangered the child's safety.  *In re N.T.*, 474 S.W.3d at 477.  On the other hand, paltry evidence relevant to each *Holley* factor does not suffice to support a finding that termination

is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 27; *In re C.E.K.*, 214 S.W.3d 492, 498 (Tex. App.—Dallas 2006, no pet.).

Parental rights cannot be terminated merely because a child might be better off living elsewhere, and termination should not be used merely to reallocate children to better and more prosperous parents. *In re C.E.K.*, 214 S.W.3d at 498–99.

The Family Code also identifies several additional factors relevant to a best interest analysis. FAM. CODE § 263.307(a), (b). These include (i) whether there is a history of abusive or assaultive conduct by the child's family, (ii) whether there is a history of substance abuse by the child's family, (iii) whether the family is willing and able to seek and complete counseling services, (iv) the parent's willingness and ability to effect positive personal changes within a reasonable period of time, and (v) whether an adequate social support system consisting of extended family and friends is available to the child. *Id.* § 263.307(b)(7), (8), (10), (11), (13).

**3.     The Evidence**

There is evidence of these facts:

**a.     Mother's Parental History**

Mother has seven children. It appears that she had three children in other relationships before she married Father. Then she and Father had three daughters together, of whom G.A.L. is the youngest.

In September 2015 (almost two years before G.A.L. was born), Mother injured one of her older daughters by disciplining her excessively with a belt, leaving marks on her body. In 2016, an order of deferred adjudication was rendered based on Mother's guilty plea to reckless injury to a child, a state jail felony. The order placed Mother on deferred probation for five years and required her to "comply with all requirements in CPS case."

Also in 2016, Mother was involved in a child-custody case concerning four of her five children, including both of her children with Father. The final order reflects that Mother was appointed as a possessory conservator of each of those four children and was permitted supervised visitation only.

### b. G.A.L.'s Birth and Removal

G.A.L. was born in July 2017. Although Mother and Father were married then, Father testified that they had separated and he was living elsewhere by that time.

Hospital personnel contacted CPS and reported that they were concerned because Mother and Father had a disagreement after G.A.L. was born. Father testified that he was "frustrated" because his name wasn't listed on G.A.L.'s birth certificate and Mother said she didn't know why that was. Then, after Mother and G.A.L. left the hospital, Father began to think that G.A.L. might not be his daughter.

In late July or early August 2017, the Department removed G.A.L. The evidence about the removal was vague, but witnesses indicated that the Department (i) removed G.A.L. because of the hospital personnel's report and (ii) had concerns because Mother had given G.A.L. to someone else. A CPS caseworker testified that Mother left G.A.L. with "somebody that she called [G.A.L.]'s auntie, who was not actually her auntie, because she was afraid that CPS was going to get involved." Then Mother "threatened to commit suicide if this woman would not give [G.A.L.] back to her." And a CPS investigative supervisor testified that Mother "did multiple things to mislead the Department into [sic] where this child was and who this child was staying with."

### c. Events in 2017 and 2018

#### (1) Violation of Orders Forbidding Mother from Supervising Children

In October 2017, the trial judge signed a temporary order requiring Mother not to supervise or live with any children under eighteen while the case was pending.

However, the Department received an anonymous tip that Mother was having unsupervised contact with some of her other children, and it investigated and tried to catch Mother violating the order. CPS caseworker Cori Holden, who worked on G.A.L.'s case until December 2018, testified that Mother told Holden that she was having unsupervised access to her two children with Father "on a pretty regular basis." Mother told the caseworker that she didn't know what to do in these situations because Father would "dump the children on her."

Mother, by contrast, testified that she had unsupervised possession of her children only one time during this case. She said that Father dropped their other two children off with her, and she took them to a clinic where she was taking parenting classes and then kept them overnight. A male friend of hers, with whom she later had a child, G., was with her when she got the children, and he stayed overnight.

Father testified and denied that he dropped his children off with Mother during this case.

### (2) Violation of Probation Condition Forbidding Mother from Using Alcohol

There was evidence that Mother admitted that she used alcohol on August 17, 2017, in violation of her probation conditions. At trial, she explained that she drank some punch, found out it might have been spiked with something, and then told her probation officer and the court about it.

On December 6, 2017, Mother went to one of her parenting classes at the Raffa Clinic. Three members of the clinic's staff smelled alcohol on Mother. They reported it to CPS that same day. Mother went to the clinic in early January upset, crying, yelling, and insisting that she didn't drink. Mother testified that she believed she smelled like alcohol because she was working at Landon's Winery and had worked that day before going to the clinic. Although the clinic's executive director testified that she "would probably guess" the alcohol smell was more beer than wine, Mother testified that Landon's produced both beer and wine.

–8–

Mother testified that she never used alcohol during this case's pendency.

### (3)   Other Events in 2018

A CASA volunteer testified that Mother didn't use safe bottle-feeding techniques when G.A.L. was very small. And during one visit with G.A.L., when Mother was pregnant with her next child, Mother fell asleep with G.A.L. on the floor next to her.

In July 2018, Mother gave birth to another son, G. His father was a man Mother testified was a friend. However, in May 2018 she had reported G.'s father to the police for stalking and harassing her.

G. was in the hospital for about two months and was removed by CPS, apparently when he was released from the hospital. G.'s CPS case was still open when this case was tried.

Holden testified that she didn't think Mother could meet G.A.L.'s physical and emotional needs because (i) Mother's income was not steady enough, (ii) Mother never had a plan for G.A.L.'s care, and (iii) Mother lived in a one bedroom apartment. Holden was concerned about Mother's finances because her budget indicated an income higher than Mother's pay stubs supported and didn't include the cost of child care.

Holden further testified that while she was working on the case one of Mother's older daughters made an outcry of sexual abuse. Holden's testimony was vague. She said that the outcry involved Father and Mother's "knowledge of the event," but she didn't identify the alleged perpetrator, nor was any evidence admitted about the investigation into the outcry. Text messages between Holden and Mother were admitted in which Mother said that she "always took [her] kids to get checked" and "[t]here were times [she] would ask the doctors while they were doing check ups to make sure they were not tampered with," apparently meaning sexually abused. But after Holden texted Mother that such exams are "really invasive and traumatic," Mother replied:

> Well the doctors believed I was ok doing it and had other parents doing the same. The last time i had her checked i do believe it was 7 years ago, before i moved to

texas. And on the record 3times, within the 12 years of her life plus her grandmother taking her since shes been with her.

Mother also said via text that she had her children checked because Mother herself had been sexually abused when she was younger. The exchange made Holden uncomfortable because she interpreted it to mean that Mother was "routinely" having her daughter "checked for sexual abuse by a doctor."

Holden also testified that Mother showed some improvement while Holden was managing the case. Mother (i) completed individual counseling, (ii) was generally consistent in her visits with G.A.L. except after she gave birth to G., (iii) completed a psychosocial and a psychological evaluation, (iv) completed parenting classes and anger management training, and (v) complied with and passed all required drug tests. She was also "clean" on every alcohol test. She was always actively working except for maybe a month around the time she gave birth to G. She was better about providing proof of income than most parents Holden worked with, and she demonstrated that she could improve with proper counseling. Mother went to an anger management course. But the provider decided that she didn't need such an intense course, so she finished her anger management counseling through an online course. Holden testified, "I do agree that [Mother] did come a long way while I had the case."

Morgan Shields became this case's CPS caseworker in December 2018.

### d. Events in 2019

This case was tried in 2019 on February 1, March 1, and May 6, 7, 8, and 10.

On April 11, 2019, Mother was discharged from probation early in her child injury criminal case.

### (1) Mother's Relationship With G.'s Father

Mother testified that G.'s father has been her neighbor for the last six years. She is not in a romantic relationship with him, but she was in a sexual relationship with him. He has given her

financial assistance. For example, he gave her the money to buy a car in 2019. He also gave her $660 in February 2019 and around $1,800 in March 2019.

However, Mother also had some difficulties with G.'s father. In February 2019, she called the police and reported that $700 had been stolen from her residence, and she told the police that she suspected either her sister or G.'s father. G.'s father came while law enforcement was still there, and Mother accused him of stealing from her. He gave her $360 at that time. At trial, Mother testified that she did not believe that G.'s father stole from her.

Also in February 2019, Mother's tires were slashed, and she reported G.'s father to the police as a potential suspect. The next day, she reported to law enforcement that G.'s father was "walking around the apartment trying to see if" Mother was home.

Finally, a police detective testified that Mother called the police on May 1, 2019, because she wanted to enter someone else's residence to get her belongings but she didn't want to get into trouble for it. In the detective's words, "she had a falling-out with her significant other and she wanted to retrieve her belongings." The owner was contacted by phone and said he didn't want Mother to enter the residence, and so she didn't. Mother's current caseworker on G.'s case testified that the residence in question belonged to G.'s father.

Nevertheless, on May 8, 2019, Mother testified that G.'s father comes over maybe once or twice a week.

### (2)     Mother's Financial and Housing Situation

There was some evidence about Mother's financial situation at the time of trial. We review it, keeping in mind that a court may not make a best interest finding or terminate parental rights based on evidence that the parent is economically disadvantaged. FAM. CODE § 161.001(c)(2).

Mother provided the Department with several different budgets over the course of the case. She budgeted $50 for food in February 2019 but reduced it to $25 in a May 2019 budget.

Mother's car was repossessed in February 2019 after she took out a title loan to pay an attorney. As of March 1, 2019, her cash reserves were $102. By May 6, 2019, she had another car, paid for with money that G.'s father gave her, and she had $900 in savings.

Mother was employed through temp agencies and, as of May 2019, she had a job making glasses and lenses for a company called Luxottica. On May 6, Mother testified she was making $11.85 an hour and working ten-hour shifts four days a week, but she was hoping to switch to a weekend schedule of three twelve-hour shifts because it was easier for her to get daycare for G.A.L. on weekends. On May 8, Mother testified that her new schedule had been approved and she would be working Friday through Sunday, 7 p.m. to 7:00 a.m., for $12.85 an hour.

Mother was ordered to pay child support of $213.01 and medical support of $25 for her two other children with Father, and she wasn't current on those obligations. For another child, she was paying $152.47 a month in child support, but she wasn't paying $25 in medical support. For yet another child, she owed $152.57 in child support and $25 in medical support, but she wasn't paying those amounts because the child's father wouldn't accept them. That child's father also testified at trial, and he said that (i) he doesn't pursue child support from Mother because he doesn't need it and (ii) he's willing to forgive any arrearage. Mother acknowledged that the attorney general was taking more out of her paychecks for child support arrearages and that this fact wasn't reflected in her budget.

Around March 2019, Mother moved into a two bedroom apartment in Commerce, Texas, with a rent of $650. Her mother and grandfather helped her by giving her $400 for the apartment deposit. Shields testified that she visited Mother's home on March 13, 2019, and the home was appropriate except there was no baby gate for the stairs. Mother produced a baby gate in the courtroom on the next day of the trial, but Shields testified that two are needed to make a stairwell safe. The next day, Mother had two baby gates in the courtroom.

Shields testified that although Mother had maintained housing and stable employment aside from health related issues, she hadn't demonstrated sufficient income to maintain her household. Although financial aid from relatives is an acceptable resource, Mother didn't produce a plan regarding who would make up any shortfalls if Mother couldn't work enough hours in a pay period or if anything else changed. Shields also expressed concern about the amount of child support Mother has been ordered to pay for her other children and possible unknown arrearages. Shields was concerned about Mother's ability to meet G.A.L.'s physical needs and that Mother had to rely on other people's money to meet her own needs.

### (3) Mother's Child Care Plan

As previously noted, Mother testified that her work schedule going forward would be Friday through Sunday, 7 p.m. to 7:00 a.m. She also testified that her job is in Dallas and it takes her eighty minutes to get there. She planned to have her relatives keep G.A.L. while Mother was at work. More specifically, she planned to rely on her cousin, J.J., who lives in Addison.

J.J. testified that she lives near Mother's workplace so she can watch G.A.L. overnight there. She further testified that she has no criminal background, was honorably discharged from the Navy, is willing to watch G.A.L. on weekends while Mother works, and is not insisting that Mother pay her for that. Moreover, J.J.'s husband is available on weekends as a back-up. J.J. testified that she was not aware that G.A.L. had any "physical issues."

Shields testified that she didn't know about J.J. until Mother testified about her at trial. She performed background checks on J.J. and her husband and found no criminal or CPS history in Texas, but they had lived here for only one year.

Mother also testified that she had three women who lived in her area who could watch G.A.L. for her if necessary. Shields testified that two of the three women passed background checks, but she had never heard of the third woman until Mother identified her at trial.

Additionally, Mother's sister T.L. testified that she lives in Bossier (Louisiana) and was willing to help watch G.A.L. any time Mother needs her to. She also said that she could help pay for a back-up if she herself couldn't do it. She said that if Mother got custody of G.A.L. right now, she would come get G.A.L. on weekends and would watch her with help from another sister. T.L. acknowledged that the first time Mother ever asked her to help with G.A.L. was on May 7, 2019 (during trial).

Shields testified that part of her concern was that Mother never produced a detailed plan explaining how she would manage G.A.L.'s child care. In early 2019, Mother identified some people who could provide child care for G.A.L. if needed, but she didn't provide a set schedule.

### (4) G.A.L.'s Needs and Foster Placement

G.A.L. was born in July 2017. She was delayed in speech, had a flat affect, was delayed in crawling and walking, and had weakness on her left side. She received in-home therapy and improved while Holden was her caseworker (2017 and 2018). As of December 2018, G.A.L. still needed physical therapy and was going to receive further evaluations and tests.

Shields, who took over G.A.L.'s case in December 2018, testified that G.A.L. had completed her physical and occupational therapy but still wore leg braces to help her balance. Aside from her braces, she didn't need anything else at the time of trial.

Shields testified that G.A.L.'s foster home was stable and her foster mother has appropriate parenting abilities. She also said that G.A.L. seems very bonded to her foster mother and that she was running around, smiling, and seeming more secure recently. The CASA volunteer also testified that G.A.L. has a good relationship with her foster mother. The Department's plan for G.A.L. was adoption by the foster mother.

G.A.L.'s foster mother testified that she is single and works as a special education teacher. She got custody of G.A.L. when she was eleven days old. She sought medical intervention when

she noticed G.A.L. wasn't hitting her milestones at about four or five months. She lives next door to her parents, and G.A.L. stays with them while foster mother is at work. The only other person who lives with the foster mother is her six-year-old adopted daughter. Her daughter and G.A.L. get along very well. According to the foster mother, G.A.L. has bonded with her and her family.

### (5) The State's Assessment of Mother in 2019

Shields was concerned about Mother's ability to meet G.A.L.'s physical needs. She was also concerned that Mother had to rely on other people's money to meet her needs. She agreed that Mother has maintained housing and stable employment aside from health-related issues, but she thought Mother hadn't demonstrated sufficient income to maintain her household.

She acknowledged that Mother was always emotionally appropriate with G.A.L. during visits and that her visits with G.A.L. improved in Shields's observation, but she was concerned about the emotional toll it would take on Mother to get G.A.L. back without a fully developed plan and support system in place. She was concerned that if Mother got G.A.L. back the Department would no longer be able to monitor G.A.L. and ensure her safety.

Shields acknowledged that Mother used safe and appropriate parenting when Shields observed two off-site visits. She also agreed that Mother completed her services and said that she generally found Mother to be cooperative. But she remained concerned about Mother's lack of parenting skills and her admission of committing felony injury to a child. She thought that the people who have said they will help Mother are a sufficient support structure for her, but Mother didn't have a plan or commitment about who would do what and what the schedule would be.

Additionally, Shields was concerned because Mother (i) testified that she hadn't read the court order about her rights and duties regarding her children, (ii) failed to follow court orders or pay child support, (iii) lacked a child care plan, and (iv) doesn't have physical custody of any of her seven children.

The CASA volunteer testified that two weeks earlier she had observed Mother's visit with both G.A.L. and G. together, and she was concerned that Mother could not keep track of them both at the same time. She saw G.A.L. get some hand sanitizer out of a bottle without Mother's noticing it.

### 4. Applying the Law to the Facts

Next we analyze the evidence in light of the relevant best interest factors.

#### a. G.A.L.'s Desires

G.A.L. was not yet two years old at the time of trial, so she was too young to have any relevant desires. *See In re M.I.A.*, No. 04-19-00227-CV, 2019 WL 5030241 (Tex. App.—San Antonio Oct. 9, 2019, no pet.) (three-year-old was too young to make his desires known). Thus, we view this *Holley* factor neutrally.

#### b. G.A.L.'s Physical and Emotional Needs

#### (1) Physical Needs

There is evidence that G.A.L. has some special physical needs, such as needing to wear leg braces. However, there is no evidence that Mother was unable to meet those needs. Although the State asserts that G.A.L. still requires many doctor visits to address her physical needs, Shields testified that to her knowledge G.A.L. had no major doctor appointments after Shields came onto the case in December 2018. She also testified that Mother sought to attend G.A.L.'s doctor appointments but was discouraged from doing so because her presence overstimulated G.A.L.

As for G.A.L.'s ordinary physical needs, the State argues that the evidence showed that Mother could not produce a financial plan that would enable her to support herself and G.A.L. It also argues that Mother is in jeopardy of being called upon to pay child support arrearages at any time and has to rely on others to meet her needs. And it points out that Mother had some difficulties with G.'s father (including making some criminal accusations against him) when he was one of her sources of financial support.

–16–

However, the trial court may not make a best interest finding against a parent based on evidence that a parent is economically disadvantaged, FAM. CODE § 161.001(c)(2), and indeed the court's termination order recites that it is not based on such evidence. Although we agree that the evidence supports a conclusion that Mother could have difficulty financially providing for G.A.L., the evidence indicates that this difficulty would be due to economic disadvantage, and there is no evidence tying her financial problems to any misconduct on her part. Therefore, we do not include this evidence in our final analysis. Moreover, Mother maintained housing and, aside from health-related issues, employment.

The State also points to evidence that, at the beginning of the case, Mother had difficulty feeding G.A.L. and did not know how much to feed her or how to make a bottle. Although the State acknowledges that this issue is not likely to arise again with G.A.L., it contends that this evidence illustrates Mother's struggles to learn how to care for a child. In our view, this evidence is not probative of Mother's ability to address G.A.L.'s physical needs almost two years later.

Moreover, Shields testified that Mother's home was appropriate except for lacking baby gates on the stairs, and the record shows that Mother acquired two baby gates during trial. She also said that Mother had appropriate food for G.A.L.

Finally, the State points to evidence that Mother's child care plan for G.A.L. changed and developed throughout the trial, arguing that this shows Mother to be incapable of planning to meet G.A.L.'s needs. However, the trial spanned three months, and Mother testified that her work schedule changed substantially near the trial's end, thus explaining the new child care plan she and her cousin J.J. testified to. Although the trial court, as the arbiter of witness credibility, might not have been bound to believe this late-breaking testimony, the State offered no evidence affirmatively showing that Mother was incapable of securing adequate child care. *See Collin Cty. Criminal Dist. Attorney's Office v. Akhavan*, No 05-10-00153-CV, 2011 WL 2028219, at \*3 (Tex.

–17–

App.—Dallas May 25, 2011, no pet.) (mem. op.) (although trial court may disbelieve a witness's testimony, such disbelief does not convert the testimony into evidence of the opposite premise). We do not agree with the State that evidence of different child care plans during a case tried piecemeal over three months demonstrates that Mother could not arrange adequate child care.

### (2)      Emotional Needs

As to G.A.L.'s emotional needs, the State argues that Mother is unable to address those needs based on the evidence that Mother gave G.A.L. to someone else soon after G.A.L. was born and then threatened to commit suicide if that person didn't give G.A.L. back to her. This is some evidence that Mother was emotionally unstable shortly after G.A.L.'s birth in July 2017. And Holden and Shields testified that they were concerned that Mother's financial situation and lack of a solid child care plan made Mother unable to see to G.A.L.'s emotional needs.

Moreover, the State argues that Mother's decision to have her older children medically checked for sexual abuse when they went for check-ups raises grave concerns about Mother's ability to provide for G.A.L.'s needs. The text message evidence about how often Mother did this was not clear, but the trial court could infer from that evidence that Mother subjected her children to unnecessary and invasive medical examinations.

There was also undisputed evidence on this factor weighing in Mother's favor, which we cannot disregard under the standard of review. Mother was consistent in attending visits with G.A.L. except around the time she gave birth to G. Both Holden and Shields thought Mother improved over time in her visits with G.A.L. Shields also testified that Mother has always been emotionally appropriate with G.A.L. during their visits. Mother successfully completed her parenting classes and an anger management class. Her psychosocial evaluation yielded a recommendation of individual counseling, which she also completed. Thus, there was undisputed

evidence that Mother's ability to handle G.A.L.'s emotional needs improved over the roughly twenty months this case pended before trial.

### (3) Conclusion

Ignoring as we must concerns arising from Mother's economic disadvantage, we conclude that the State adduced no evidence that Mother was unable to provide for G.A.L.'s physical needs and only paltry evidence that she could not provide for G.A.L.'s emotional needs.

### c. Physical and Emotional Dangers to G.A.L.

As to this factor, the State relies largely on the physical and emotional needs evidence discussed above. It also points out that (i) Mother had another CPS case involving her other children, (ii) Holden was concerned for G.A.L.'s safety because of Mother's prior physical abuse of an older daughter, and (iii) Mother was ordered not to have unsupervised access to her other children.

There is evidence that Mother's prior CPS case involving four of her children started because Mother excessively disciplined an older daughter with a belt, leading to criminal charges. But that incident happened almost two years before G.A.L. was born, there is no evidence that Mother ever committed another similar act, and the trial court released Mother from probation for that incident ahead of schedule. So although Mother's offense is relevant to the danger issue, it is not strong evidence in light of the entire record. *See Wetzel v. Wetzel*, 715 S.W.2d 387, 391 (Tex. App.—Dallas 1986, no writ) ("[I]n a termination suit, acts done in the distant past, without showing a present or future danger to a child, cannot be sufficient to terminate parental rights.").

There is also evidence that, contrary to court order, Mother had possession and supervision of two of her children at least once. She testified that her friend, G.'s father, spent the night with her and the children on that occasion. Although there is some evidence that Mother *thought* that G.'s father slashed her tires on one occasion and was stalking her outside her apartment on another,

there is no evidence that G.'s father ever harmed or endangered a child. So we conclude that the evidence of Mother's unsupervised possession of two other children is no evidence of danger to G.A.L. now or in the future.

We conclude that the State's evidence of this factor was weak but not nonexistent.

### d. Parental Abilities of Those Seeking Custody

The evidence discussed above supports a conclusion that Mother's parental abilities were somewhat lacking, particularly before G.A.L.'s birth (as shown by her felony child injury charge) and right after her birth (as shown by her briefly giving G.A.L. to someone else). But the undisputed evidence also shows that Mother tried to improve her parenting skills and did in fact improve them over the course of the case. For example, she successfully completed parenting and anger management classes. Further, Shields testified that Mother used safe and appropriate parenting techniques during two off-site visits, completed her services, and was generally cooperative

The State argues that Mother's poor parenting skills are also shown by her testimony that she wanted G. to be placed with G.'s father if not with her, even though she made some complaints of criminal activity against G.'s father.

There is also evidence that G.A.L.'s foster mother has good parenting skills and wants to adopt G.A.L.

But "[t]he best interest standard does not permit termination merely because a child might be better off living elsewhere." *In re C.E.K.*, 214 S.W.3d 492, 504 (Tex. App.—Dallas 2006, no pet.). And "[t]ermination should not be used to merely reallocate children to better and more prosperous parents." *Id*.

Accordingly, we conclude that the evidence does not show that Mother's parenting skills are so poor as to overcome these principles, and thus this factor does not support the best interest finding.

### e. Programs Available to Assist Those Seeking Custody

The trial court's letter ruling indicated that this factor was neutral, and the State does not argue otherwise.

Mother argues, and we agree, that there was evidence that this factor supported her. The State adduced no evidence that Mother was unwilling to comply with the counseling and other services required of her during this case, and there was undisputed evidence that she completed those services. Moreover, she successfully completed her probation early. She testified that she was willing to seek government assistance with food and health care and any other programs to address G.A.L.'s special needs if available.

We conclude that there was some undisputed evidence favoring Mother as to this factor.

### f. The Plans of Those Seeking Custody and the Stability of the Home and the Proposed Placement

We address these *Holley* factors together.

The evidence supports a finding that the foster mother's plans for G.A.L. are superior to Mother's and that her home is probably more stable than Mother's.

Furthermore, the evidence shows that Mother's plans for G.A.L.'s care changed and developed substantially during trial and supports an inference that Mother needs help from others to maintain her housing situation.

But again, we cannot consider Mother's economic disadvantage as evidence supporting the best interest finding. FAM. CODE § 161.001(c)(2).

The State also argues that the evidence that Mother had a loud argument with Father right after G.A.L.'s birth is relevant to these factors. We disagree; this incident is not relevant to Mother's plans for G.A.L. or her home's stability.

Ignoring Mother's economic disadvantage, we conclude that there is still some evidence of these factors that favors the State's position. The foster mother's employment as a special education teacher and close familial support network could reasonably be viewed as superior to Mother's situation. Still, the State did not adduce any evidence showing that Mother had no child care plan, had a bad child care plan, or that Mother's home was necessarily unstable. Thus, we conclude that the evidence of these factors isn't strong enough to overcome the principle that "[t]he best interest standard does not permit termination merely because a child might be better off living elsewhere." *In re C.E.K.*, 214 S.W.3d at 504. Thus, they do not support termination.

### g. Mother's Acts, Omissions, and Any Excuses for Them

The State argues that these factors support termination based on all the evidence discussed above, Mother's excessive discipline of an older child, and the evidence that, despite her denials at trial, Mother twice used alcohol during her probation in violation of her probation conditions.

The evidence supported a finding that Mother used alcohol twice over the twenty-one months this case was pending. But she didn't have custody of G.A.L. at those times, and there was no evidence of intoxication or harm of any kind. Although the evidence supports a finding that Mother violated the terms of her probation on those two occasions, we reject the State's contention that this evidence shows that Mother's relationship with G.A.L. was inappropriate.

As for the other evidence, we conclude that there is some evidence that Mother's relationship with G.A.L. was not an appropriate one when this case started, but other undisputed evidence shows that the relationship improved over the case's duration. There was evidence that Mother acted inappropriately right after G.A.L. was born by giving her to someone else and then

threatening suicide if the person didn't return G.A.L. to Mother.  But after G.A.L. was removed, Mother did what the Department required her to do in terms of counseling and classes.  Her caseworkers acknowledged her improvement over time.

We conclude that the evidence weakly supports these two termination factors.

### h.      Section 263.307(b) Factors

Family Code § 263.307(b) lists other factors that the court should consider in determining a child's best interests.  *See* FAM. CODE § 263.307(a)–(b); *In re C.V.L.*, No. 05-19-00506-CV, 2019 WL 6799750, at *10–11 (Tex. App.—Dallas Dec. 13, 2019, no pet. h.).

One statutory factor is supported by some evidence in this case, whether there is "a history of abusive or assaultive conduct by the child's family."  FAM. CODE § 263.307(b)(7).   As repeatedly mentioned above, there is evidence that Mother injured one of her older children almost two years before G.A.L. was born.  We have already addressed this evidence under the *Holley* factors.

There is no evidence of "a history of substance abuse by the child's family or others who have access to the child's home."  *Id*. § 263.307(b)(8).

Another factor is whether the parent is willing and able to "effect positive environmental and personal changes within a reasonable period of time."  FAM. CODE § 263.307(b)(11).  There is undisputed evidence in this case that Mother was willing and able to make such changes over the course of this case.

Still another factor is whether the parent is willing and able to "seek out, accept, and complete counseling services."  *Id*. § 263.307(b)(10).  There is undisputed evidence in this case that Mother did just that.

Finally, another statutory factor is "whether an adequate social support system consisting of an extended family and friends is available to the child."  *Id*. § 263.307(b)(13).  Shields testified

–23–

that in January 2019 Mother gave her names of five possible caregivers for G.A.L., and four of them passed her background checks; she was unable to contact the fifth. Two of those who passed the background checks were Mother's cousins.

Mother's sister T.L. testified at trial that she is willing to help watch G.A.L. and to help Mother financially. And Mother's cousin J.J. testified that she lives near Mother's job and that she and her husband are willing to keep G.A.L. while Mother is at work.

Thus, there is undisputed evidence supporting three § 263.307(b) factors in Mother's favor on the best interest determination.

### 5. Factor Analysis Summary and Conclusion

Paltry evidence relevant to each of the *Holley* factors will not suffice to uphold a finding that termination is in the child's best interest. *In re C.E.K.*, 214 S.W.3d at 498. And the best interest standard does not permit termination merely because the child might be better off living elsewhere. *Id*. at 498–99. Applying these principles, we conclude that the best interest evidence here is legally insufficient to support the best interest finding and thus the termination order.

There is some evidence supporting the State's position as to G.A.L.'s needs and possible danger to her in the future, but that evidence is weak. The evidence about Mother's parental abilities shows only that the child might be better off living with her foster mother, not that Mother's abilities are so poor as to overcome the "strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

Furthermore, Mother took advantage of programs intended to help her promote G.A.L.'s best interest.

Although the foster mother's home and her plans for G.A.L. could reasonably be viewed as superior to Mother's, the disparity is not so great, and Mother's situation is not so poor, that we

can regard these factors as supporting termination. The evidence that Mother's acts and omissions signal an improper parent–child relationship with G.A.L. is paltry. And, considering the undisputed evidence in Mother's favor, as we must, we conclude that the statutory best interest factors favor Mother.

Because best interest determinations are fact-intensive, precedents have limited usefulness. But our *In re C.E.K.* decision lends us some support. In that case, the State removed two young children from the home following a report of domestic violence. There was evidence that the mother threatened the father with a knife and "tossed him their child." 214 S.W.3d at 497. One child had a fresh skull fracture. The mother admitted using marijuana in the home with the children present and while pregnant with her second child. CPS deemed the mother's housing unstable and unsuitable for children, but she completed her anger management and parenting classes and even took an additional class. CPS and CASA were critical of the mother's parenting skills as demonstrated during supervised visits.

Mindful that parental rights cannot be terminated merely because a child might be better off living elsewhere and that the mother made significant improvements in her life, we held that the best interest evidence was legally insufficient: "a reasonable fact finder could not form a firm belief or conviction that it is in the children's best interest that Mother's parental rights be terminated." *Id*. at 504. We reach the same conclusion here.

Concluding that (i) the evidence supporting the best interest factors adverse to Mother was paltry and (ii) there was substantial undisputed evidence favoring Mother's position on those factors, we hold that the evidence supporting the finding that termination of Mother's rights was in G.A.L.'s best interest was legally insufficient. Accordingly, we sustain Mother's first issue.

### 6. Conservatorship

The trial court also appointed the Department as G.A.L.'s permanent managing conservator. In support, the court found that (i) appointing G.A.L.'s parents as permanent managing conservators was not in G.A.L.'s best interest because the appointment would significantly impair her physical health or emotional development and (ii) appointing the Department was in G.A.L.'s best interest. Mother has not challenged the Department's appointment on appeal, so we do not disturb that appointment. *See In re J.A.J.*, 243 S.W.3d 611, 612–13 (Tex. 2007); *In re A.F.*, No. 05-17-00392-CV, 2017 WL 4116945, at *7 (Tex. App.—Dallas Sept. 18, 2017, no pet.) (mem. op.).

## III. DISPOSITION

We reverse the order of termination to the extent it terminates Mother's parental rights to G.A.L. and render judgment denying the Department's request to terminate Mother's parental rights to G.A.L. We affirm the remainder of the termination order and remand this case for further proceedings consistent with this opinion.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

190844F.P05

–26–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF G.A.L., A CHILD

No. 05-19-00844-CV

On Appeal from the 196th Judicial District Court, Hunt County, Texas
Trial Court Cause No. 85844.
Opinion delivered by Justice Whitehill. Justices Partida-Kipness and Pedersen, III participating.

In accordance with this Court's opinion of this date, the trial court's Order of Termination is **REVERSED** to the extent it terminates appellant Altrial Danielle Lee's parental rights, and judgment is **RENDERED** that the Texas Department of Family and Protective Services' request to terminate Altrial Danielle Lee's parental rights is **DENIED**.

We **AFFIRM** the trial court's Order of Termination in all other respects. We **REMAND** the case for further proceedings consistent with the opinion.

It is **ORDERED** that appellant Altrial Danielle Lee recover her costs of this appeal from appellee Texas Department of Family and Protective Services.

Judgment entered February 6, 2020.